**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MIGUELINA PEÑA, | : | |
| *Individually and as Independent* | : | |
| *Administrator of the Estate of Ricardo* | : | |
| *Muñoz, deceased* | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 21-590 |
| | : | |
| v. | : | |
| | : | |
| CITY OF LANCASTER *et al.*, | : | |
| | : | |
| Defendants. | : | |

<u>**MEMORANDUM OPINION**</u>

**SCHMEHL, J. /s/ <u>JLS</u>**                                                 **September 7, 2023**

Plaintiff Miguelina Peña initiated this action following the shooting and killing of her 27-year-old son, Ricardo Muñoz, by Lancaster City police officer Karson Arnold.  Pursuant to the ten federal and state law claims remaining in this case, Ms. Peña seeks damages and other relief from Officer Arnold, the City of Lancaster, and former Lancaster City police chief Jarrad Berkihiser.  Defendants filed an Answer disputing certain allegations from the Complaint and raising affirmative defenses.  Subsequently, on February 10, 2022, Defendants filed the instant *Motion for Judgment on the Pleadings* (ECF No. 55).  For the reasons set forth below, the Motion is granted in part and denied in part.

## I.    BACKGROUND

### A.    Pleaded Facts

This case arises from the fatal shooting Mr. Muñoz on September 13, 2020.  As detailed in Ms. Peña's Complaint, Mr. Muñoz, who had schizophrenia and bipolar disorder, was suffering from a mental health crisis at his mother's home, eventually leading one of his sisters to call 911.

(Compl. at 1, ¶ 37, ECF No. 1.)  Officer Arnold was dispatched to the scene and arrived at around 4:00 p.m.  (*Id.* ¶ 23.)  As Officer Arnold approached Ms. Peña's home, Mr. Muñoz retrieved a knife and, exiting the home, ran off the front porch towards Officer Arnold, who shot Mr. Muñoz four times.  (*Id.* ¶¶ 24–27, 29, 44.)  According to the Complaint, additional police officers arrived shortly thereafter and "intervened to prevent [Mr. Muñoz] from getting emergency medical attention by cancelling the ambulance that had previously been dispatched to the scene."  (*Id.* ¶ 64.) Mr. Muñoz allegedly did not receive medical attention until 6:20 p.m.—over two hours after his shooting at around 4:00 p.m.  (*Id.* ¶¶ 66–67.)  The coroner reportedly determined Mr. Muñoz's time of death to be 6:35 p.m.  (*Id.* ¶ 66.)  Finally, Ms. Peña alleges that following the shooting, "various police officers tackled [her] against a police vehicle," thereby injuring her leg, and subsequently detained her at the police station until she involved an attorney.  (*Id.* ¶¶ 139–40.)

Ms. Peña contends that the City "had become familiar with [Mr. Muñoz's] psychiatric disability" because, prior to his killing, the City "had multiple interactions" with Mr. Muñoz, including "on at least five other occasions since 2019."  (*Id.* ¶¶ 32–34.)  Despite this history, Ms. Peña claims that the City did not "place[] a hazard alert on the family's home for future service calls."  (*Id.* ¶ 36.)  For the September 20, 2022, incident in particular, Ms. Peña alleges that Mr. Muñoz's sister informed the 911 operator that Mr. Muñoz dealt with mental illness, that "there were no weapons, drinking, or drug use involved" in the emergency, and that the family "simply needed help 'with you bringing [Mr. Muñoz] to the hospital.'"  (*Id.* ¶¶ 38–40.)  Ms. Peña further alleges that dispatch informed Officer Arnold of Mr. Muñoz's mental illness and ongoing mental health crisis.  (*Id.* ¶ 41.)  Ms. Peña asserts that because Officer Arnold failed to wait for backup and either "was not equipped with, or unreasonably failed to use, non-lethal weapons, such as a Taser ERD," Officer Arnold "did not have a de-escalation option planned," resulting in the fatal shooting of Mr. Muñoz.  (*Id.* ¶¶ 42, 45–46.)

According to the Complaint, this is not an isolated incident for Lancaster police.  Ms. Peña alleges "widespread failures" of the City and its police department, including the following: "operat[ing] a dysfunctional disciplinary system for Lancaster Police officers accused of serious misconduct"; "fail[ing] to conduct independent investigations of incidents involving officers who use excessive force or violate other constitutional rights"; maintaining "deficient policies and practices regarding officer supervision and training"; and having to defend against and settle various lawsuits concerning excessive force or other constitutional violations.  (*Id.* ¶¶ 50–61.) Taken together, Ms. Peña claims, these facts establish "a clear pattern" of constitutional violations by the City's police department that City and police leadership have failed to rectify.  (*Id.* ¶¶ 60, 62.)

### B.      Summarized Disposition of the Twelve Counts

Based on the foregoing allegations, Ms. Peña brought 12 claims that seek various damages, including punitive damages, as well as attorneys' fees.  (*Id.* ¶¶ 68–151.)  Count I alleges excessive use of deadly force by Officer Arnold in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.[1]  Because the Court finds that Officer Arnold is entitled to qualified immunity as to the shooting of Mr. Muñoz, Count I must be dismissed.  Count II, arising from that same shooting, seeks to establish liability against the City under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  Below, the Court finds that this claim survives Defendants' Motion regardless of the disposition of Count I.

Count III was brought as to former Defendant Lancaster County alone, and the Court previously dismissed that party and Count III.  (*See* ECF Nos. 42, 43.)  Count IV, brought against

---

[1]      Plaintiff has agreed to withdraw the portion of Count I that invokes substantive due process under the Fourteenth Amendment.  (*See* Pl.'s Br. 14, ECF No. 71.)

all Defendants, is predicated on the alleged denial of medical care to Mr. Muñoz.  Material issues of fact preclude judgment on the pleadings as to Officer Arnold, and Ms. Peña has sufficiently pleaded this claim as to Chief Berkihiser and the City.  Count V relates to the allegedly deficient hiring, training, supervision, and monitoring practices maintained by the City and Chief Berkihiser.  Other than the portion of Count V dealing with the hiring of Officer Arnold, Ms. Peña has sufficiently pleaded these claims and is entitled to investigate them more thoroughly through discovery.

Counts VI through VIII assert various claims under Pennsylvania law.  The Court rejects Defendants' argument that Pennsylvania immunity law precludes liability for Counts VI and VII, and Defendants have not otherwise challenged the sufficiency of the pleadings for those Counts. (Ms. Peña has agreed to withdraw her claim in Count VII as to the City (*see* Pl.'s Br. 23) but otherwise maintains this claim against Officer Arnold and Chief Berkihiser.)  Ms. Peña has also voluntarily dismissed Count VIII as to all Defendants.  (*See* Pl.'s Br. 23.)

Count IX asserts violations of the Americans with Disabilities Act as to the City and survives Defendants' Motion.  Counts X through XII relate to injuries suffered by Ms. Peña herself. Ms. Peña has agreed to withdraw Counts X and XII as to the City (*see* Pl.'s Br. 23), so Count X will proceed as to Officer Arnold alone, and Count XII will proceed as to unknown police officers alone.  As above, the Court finds that Pennsylvania immunity law does not bar Count X.  Ms. Peña brings Count XI as a *Monell* claim against the City and unknown officers, and Defendants contest only the *Monell* liability as to the City.  The Court rejects that argument as well.

## II.   JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over the claims in this matter pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a).  Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Ms. Peña's claims occurred in this District.

Defendants have made their motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  Rule 12(c) motions are reviewed under the same standard as motions to dismiss under Rule 12(b)(6).  *See Wolfington v. Reconstructive Orthopaedic Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019).  This Court, "'view[ing] the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party,' . . . may not grant the motion 'unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.'"  *Id.*  (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016)).

Further, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220–21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).  While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Third Circuit requires this Court to apply a three-step analysis under a Rule 12(b)(6) motion:  (1) the Court "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim'"; (2) the Court "should identify allegations that, 'because they are no more than

conclusions, are not entitled to the assumption of truth'"; and (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679); *see also Burch*, 662 F.3d at 221.

## III.   ANALYSIS

### A.   Preliminary Issues

#### 1.   Claims Against Chief Berkihiser in His Official and Personal Capacities

The U.S. Supreme Court has explained that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690 n.55; *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Accordingly, courts routinely dismiss official-capacity defendants if the plaintiff has also sued that official's government employer. *See, e.g.*, *Baez v. Lancaster County*, 487 Fed. App'x 30, 32 (3d Cir. 2012); *Cuvo v. De Biasi*, 169 Fed. App'x 688, 693 (3d Cir. 2006); *Shelton v. City of Philadelphia*, 2021 WL 3857856, at *5 (E.D. Pa. Aug. 30, 2021) (gathering cases). Given that Ms. Peña has brought claims against both the City and Chief Berkihiser, Defendants ask the Court to dismiss Chief Berkihiser from the case. (Defs.' Br. 26.)

The Court agrees that to the extent that Ms. Peña has sued Chief Berkihiser in his official capacity, those claims must be dismissed. Ms. Peña, however, appears to have also sued Chief Berkihiser in his personal capacity. From the outset, the Complaint's caption mentions both his official and individual capacities. When describing the parties, Ms. Peña alleges, on the one hand, that Chief Berkihiser "was acting under the color of law in the course and scope of his employment" and, therefore, "is being sued in his official capacity as Chief of Police for CITY"

(Compl. ¶ 9), but on the other hand, that Chief Berkihiser "was personally on notice of the unconstitutional deficiencies" in police policy and "with deliberate indifference failed to correct said unconstitutional deficiencies" (*id.* ¶¶ 10–11).   Later, Ms. Peña also alleges that Chief Berkihiser, as Officer Arnold's supervisor, "had implicitly or explicitly permitted the use of lethal force when non-lethal force would have been reasonable."  (*Id.* ¶ 31.)

The Third Circuit has outlined two theories of supervisory liability that may attach to Chief Berkihiser in his personal capacity:  (1) "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm'"; and (2) "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."  *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (first quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989), and then citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995)).   Although paragraph 9 of the Complaint only mentions Chief Berkihiser's official capacity, other allegations make clear that Ms. Peña is invoking personal liability through both theories of supervisory liability.  Defendants argue that the Complaint fails to allege that Chief Berkihiser was "personally, affirmatively involved in the alleged unconstitutional conduct" (Defs.'s Br. 26), but that claim is belied by Ms. Peña's allegations that police leadership (presumably including Chief Berkihiser) knew of constitutionally deficient policies and practices (*see* Compl. ¶¶ 50–62 (describing deficient policies and other allegedly

similar lawsuits)), failed to correct them, and implicitly or explicitly approved of them.[2] Accordingly, the Court will consider the sufficiency of the pleadings as to Chief Berkihiser in his personal capacity.[3]

## 2.   Consideration of Certain Video and Audio Recordings

Before considering Officer Arnold's qualified immunity defense, the Court must address whether it may consider video footage captured by his body-worn camera, as Defendants urge the Court to do.  (*See* Defs.' Br. 1–2, 5–6; Defs.' Reply 1–2, ECF No. 73.)  Also at issue (though given less attention by the parties) is an audio recording of the 911 call made by Mr. Muñoz's sister.  "[T]he court in a motion on the pleadings reviews not only the complaint but also the answer and written instruments attached to the pleadings."  *Phillips v. Transunion*, LLC, 2012 WL 1439088, at *3 (E.D. Pa. Apr. 25, 2012) (quoting *Sprague v. Neil*, 2007 WL 3085604, at *2 (M.D. Pa. Oct. 19, 2007)).  The Court may also consider matters of public record and any "undisputedly authentic

---

[2]      Courts have decided whether a police chief is a "policymaker" on a case-by-case basis. *See, e.g.*, *Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010) (discussing two cases in which "the determination that the chief of police was a policymaker was made only after examining the chief's responsibilities and decisionmaking authority with respect to the conduct at issue").  At the pleadings stage, Ms. Peña has done enough to state a claim against Chief Berikhiser, but further development of the record is needed to determine whether, under Pennsylvania law, he possessed "final, unreviewable discretion" to make policy "*in the particular area* of municipal business in question."  *Id.* (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006)); *see also Kocher v. Larksville Borough*, 926 F. Supp. 2d 579, 606 (M.D. Pa. 2013) (suggesting that under Pennsylvania law, a municipal police chief is likely *not* a final policymaker unless a mayor has delegated power to the police chief), *aff'd*, 548 F. App'x 813 (3d Cir. 2013).

[3]      Following the U.S. Supreme Court's decision in *Iqbal*, in which that Court rejected the theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," 556 U.S. at 677, it remains unclear "whether *Iqbal* eliminated—or at least narrowed the scope of—supervisory liability," as the Third Circuit has expressly declined to answer that question, *Jankowski v. Lellock*, 649 F. App'x 184, 188 (3d Cir. 2016).  In the absence of further guidance from the U.S. Supreme Court or the Third Circuit, this Court will continue to entertain the two theories of supervisory liability endorsed by the Third Circuit.  *A.M. ex rel. J.M.K.*, 372 F.3d at 586.

document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Courts addressing this issue have generally advised caution in relying on video footage that relates to only a portion of the events alleged in a complaint. *See, e.g.*, *Slippi-Mensah* v. *Mills*, 2016 WL 4820617, at *3 (D.N.J. Sept. 14, 2016) (declining to consider dashboard footage of a traffic stop that "only encompasse[d] one part of the events that are the basis for plaintiff's claims" and, in any event, did not fall within the *Pension Benefit* exception, because the mere existence of "a video that captured the events complained of in the complaint . . . does not transform that video into a 'document' upon which the complaint is based"); *Velez v. Fuentes*, 2016 WL 4107689, *8 (D.N.J. July 29, 2016) (declining to consider traffic stop footage in part because "the video does not capture the events leading up to the stop, nor does it allow the Court to hear everything said by Plaintiff"). Further, even if a plaintiff's claims are indeed "based on" a recording, a court may only consider it if it is "undisputedly authentic." *Pension Ben. Guar. Corp.*, 998 F.2d at 1196; *see also Brown v. City of San Diego*, 2017 WL 3993955, at *2 (S.D. Cal. Sept. 11, 2017) (declining "to consider the body-worn camera video evidence when deciding Defendants' motion" for judgment on the pleadings, because "Plaintiff asserts there is a 'factual dispute as to what is shown on the videos' and contests the video evidence's authenticity, stating that he does not, for example, know whether 'this video is all the video in the case' or whether the video has been edited").

From the outset, Ms. Peña disputes the authenticity of the video footage. (Pl.'s Br. 7 (claiming that the footage is "edited" and "[in]complete").) The YouTube link provided in Defendants' answer does reflect at least minor editing and differs from the video attached to Defendants' Motion. In any event, Ms. Peña's Complaint implicates significant events *not* captured by the recordings, as in *Slippi-Mensah* and *Velez*. Consistent with those cases, the

recordings at issue are neither integral to the Complaint nor the basis for Ms. Peña's claims. They reveal little to nothing about, for example, Defendants' previous interactions with Mr. Muñoz, the adequacy of Defendants' policies considering these interactions and other incidents, Officer Arnold's knowledge as he arrived at the scene, or the medical care required by Mr. Muñoz at various points after the shooting.

Further, to the extent that Defendants ask the Court to resolve issues of factual interpretation arising from the recordings, such as the reasonableness of Officer Arnold's actions considering various circumstances, that is an improper role for the Court to play in deciding a Rule 12(c) motion. *See Slippi-Mensah*, 2016 WL 4820617, at *3 (reasoning that although a video might properly evidence "that a particular identifiable statement was made," a court cannot rely on it, for purposes of a motion to dismiss, to resolve "issues of factual interpretation" posed by "[t]he context of the statements, the identities and tone of voice of the speakers, [and] the decisions that may have preceded or surrounded the [filmed event]" (quoting *Liebler v. City of Hoboken*, 2016 WL 3965198 (D.N.J. July 21, 2016))). And although aspects of the recordings arguably contradict certain of Ms. Peña's allegations, the Court does not rely on any such allegations in resolving the present Motion. *See Samoles v. Lacey Twp.*, 2014 WL 2602251, at *3 (D.N.J. June 11, 2014) (cautioning courts to "not draw inferences that are inconsistent with the video evidence" (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007))). The parties may, of course, rely on the recordings at later stages of these proceedings and on a more fully developed record.

**B.    Count I Must Be Dismissed Because of Qualified Immunity for Officer Arnold as to the Shooting of Mr. Muñoz**

In furtherance of the purposes of qualified immunity—namely, protecting a defendant from the burdens of even pretrial matters, such as discovery—controlling case law counsels the Court to address Officer Arnold's qualified immunity claim sooner rather than later. *See, e.g.*, *Oliver v.*

*Roquet*, 858 F.3d 180, 188 (3d Cir. 2017) (overturning district court that postponed resolution of qualified immunity claim pending further discovery) (citing *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (the issue of immunity should be resolved "at the earliest possible stage in litigation").  For the present motion, "we look only to the complaint to see whether there is any set of facts plaintiff can prove that would support a denial of immunity."  *Kulwicki v. Dawson*, 969 F.2d 1454, 1462 (3d Cir. 1992).  Courts assess a claim of qualified immunity, which protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), by considering two prongs.  "First, a court must decide 'whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right.'"  *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015) (quoting *Pearson*, 555 U.S. at 232).  "[S]econd, the court must determine 'whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.'"  *Id.* (quoting *Pearson*, 555 U.S. at 236).

Here, Ms. Peña argues that judgment on the pleadings is inappropriate considering differences between the facts alleged in her Complaint and those asserted by Defendants in their Answer.  (Pl.'s Br. 4–5.)  As set forth below, the pleadings, when construed in favor of Ms. Peña, satisfy the first prong of the qualified immunity analysis.  To the extent that Defendants' Answer contradicts these allegations in a material way, those contradictions preclude judgment on the pleadings as to that first prong.  But under current case law, there is no set of facts that Ms. Peña can prove that would satisfy the second prong of the qualified immunity analysis.  Accordingly, Officer Arnold is entitled to such immunity as to the shooting of Mr. Muñoz, and the Court must dismiss Count I.

1.        **Violation of a Constitutional Right**

Plaintiff alleges that Officer Arnold used excessive force in shooting Mr. Muñoz, thereby violating his constitutional right to be free from unreasonable searches and seizures.  The Third Circuit has explained that "[t]o state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable."  *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599 (1989)).  The parties do not dispute that a seizure occurred.  *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").  Accordingly, "[t]he pivotal question is when the use of deadly force is reasonable."  *Abraham*, 183 F.3d at 288.

Reasonableness depends on "the totality of the circumstances" leading up to an allegedly unlawful seizure.  *Id.* at 289–91.  Without imposing "the 20/20 vision of hindsight," and given "the fact that police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 396–97 (1989), this Court must consider the following factors:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, . . . whether he is actively resisting arrest or attempting to evade arrest by flight[,] . . . the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Couden v. Duffy*, 446 F.3d 483, 496–97 (3d Cir. 2006) (first citing *Carswell v. Borough of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004), and then citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

Ms. Peña alleges that Officer Arnold "responded to a call involving [Mr. Muñoz], who was experiencing a mental-health crisis." (Compl. ¶ 23.) Officer Arnold approached Mr. Muñoz's home "without waiting for backup" (*id.* ¶ 24), at which point Mr. Muñoz "retrieved a knife that he had kept for self-defense" from his bedroom (*id.* ¶ 25). Ms. Peña alleges that Mr. Muñoz "then exited his home, at which time he was immediately shot . . . ." (*Id.* ¶ 26.) Elsewhere, the Complaint describes Mr. Muñoz as "running down the front steps of his family's house in the officer's direction" and "moving down the sidewalk, as if trying to get past the officer." (*Id.* ¶ 44.)

If these events, as framed by Ms. Peña, were the *only* relevant context to the shooting, they would arguably justify Officer Arnold's use of deadly force: Mr. Muñoz "pose[d] an immediate threat to the safety of the officer or others"; he was "actively resisting arrest or attempting to evade arrest by flight"; neither party disputes that he was armed with a knife; and Officer Arnold had limited time to respond to Mr. Muñoz running towards him. *Couden*, 446 F.3d at 496–97; *cf. Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (once an individual experiencing drug-induced psychosis "began reaching for [the responding officer's] gun, [the officer] was justified in using deadly force to defend himself").[4] Ms. Peña, however, urges the Court to consider additional context leading up to Officer Arnold's arrival at the scene of the shooting, and the Court agrees that weighing the "totality of the circumstances" requires doing so. *See Abraham*, 183 F.3d at 291 ("'Totality' is an encompassing word. It implies that reasonableness should be sensitive to all of the factors bearing on the officer's use of force."); *Johnson*, 837 F.3d at 351 ("We do not automatically discount Plaintiff's Fourth Amendment argument . . . that a 'totality of

---

[4]     Further, even if Mr. Muñoz was only trying to "get past the officer" to flee—arguably an unlikely interpretation of that conduct—the Supreme Court has held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11.

the circumstances' analysis should account for whether the officer's own reckless or deliberate conduct unreasonably created the need to use deadly force.").

The additional context that Ms. Peña emphasizes falls into two categories: (1) Mr. Muñoz's previous interactions with police, which should have informed and guided the response to this incident; and (2) the strategies employed by Officer Arnold in particular, given his knowledge of the situation and his training. As to the first category, Ms. Peña alleges that "on at least five other occasions since 2019, including one just few weeks" prior to the shooting, Mr. Muñoz's family had reached out to municipal authorities "seeking assistance to manage [Mr. Muñoz's] schizophrenic episodes." (Compl. ¶ 34.) Defendants allege that during one of these prior interactions, Mr. Muñoz "had engaged in another unprovoked attacked involving a knife" and, when officers arrived at the scene, had "ignored repeated commands from officers to drop the knife." (Answer ¶¶ 32–34.) Ms. Peña does not directly dispute this allegation but cites it as creating a material issue of fact. (Pl.'s Br. 6.) In any event, given this history of prior interactions, Ms. Peña alleges that Defendants "had become familiar with [Mr. Muñoz's] psychiatric disability" but failed to "place[] a hazard alert on the family's home for future service calls." (Compl. ¶¶ 33, 36.)

As to the second category, Ms. Peña argues that Officer Arnold's strategy unnecessarily resulted in Mr. Muñoz's shooting. Mr. Muñoz's sister allegedly informed a 911 operator that Mr. Muñoz "had mental issues, including schizophrenia and bipolar disorder," but that "there were no weapons, drinking, or drug use involved" in the ongoing incident. (*Id.* ¶¶ 38–39.) Instead, the family "simply needed help 'with . . . bringing [Mr. Muñoz] to the hospital.'" (*Id.* ¶ 40.) It is not clear from the pleadings what the dispatcher told Officer Arnold about the situation. The Complaint alleges that "dispatch provided information to ARNOLD that [Mr. Muñoz] suffered from a mental-health illness and was experiencing a mental-health crisis" (*id.* ¶ 41), but

Defendants' denial focuses on the Complaint's characterization of Mr. Muñoz's sister's 911 call and says nothing about the dispatcher's communications with Officer Arnold (Answer ¶¶ 37–41, ECF No. 19).  Further, the Answer later claims that Officer Arnold declined to wait for backup in part because of the "lack of information regarding whether [Mr. Muñoz] was in possession of a weapon" (*id.* ¶ 42), yet Mr. Muñoz's sister allegedly informed the 911 operator that there were "no weapons" involved in the incident (Compl. ¶ 39).  Whatever the nature of Officer Arnold's knowledge, Ms. Peña alleges that he then approached her home "with no plan and without waiting for backup." (*Id.* ¶ 24.)  As a result of these choices, Ms. Peña claims, "Defendant ARNOLD did not have a de-escalation option planned and failed to utilize de-escalation tactics of any kind." (*Id.* ¶ 45.)

Also related to the second category, Ms. Peña alleges that Officer Arnold "disregarded police guidelines by not waiting for backup and by approaching the home on his own." (Compl. ¶ 42.)  Defendants, however, claim that "Officer Arnold approached Plaintiff's residence in a manner consistent with his training and experience . . . ." (Answer ¶ 24.)  Defendants also claim that the City and its police force "implement and enforce policies and practices to protect the constitutional and civil rights of Lancaster citizens, including persons with mental health disabilities during encounters with police." (*Id.* ¶ 52.)  The pleadings do not indicate the contents of these policies and whether Officer Arnold in particular was aware of them.

The Third Circuit previously rejected a Fourth Amendment claim where a police officer, by failing to wait for backup, allegedly unnecessarily escalated his encounter with a man experiencing drug-induced psychosis. *Johnson*, 837 F.3d at 351–52.  That case, however, involved "exceptional circumstances" justifying the rejection of the plaintiff's claim, including that "the officer [was] rushed, choked, slammed into vehicles, and forcibly dispossessed of his service

weapon." *Id.* Because not all cases will involve such "exceptional circumstances," the Third

Circuit cautioned future courts as follows:

> Given the extreme facts of this case, our opinion should not be
> misread to broadly immunize police officers from Fourth
> Amendment liability whenever a mentally disturbed person
> threatens an officer's physical safety. Depending on the severity
> and immediacy of the threat and any potential risk to public safety
> posed by an officer's delayed action, it may be appropriate for an
> officer to retreat or await backup when encountering a mentally
> disturbed individual. It may also be appropriate for the officer to
> attempt to de-escalate an encounter to eliminate the need for force
> or to reduce the amount of force necessary to control an individual.
> Nor should it be assumed that mentally disturbed persons are so
> inherently unpredictable that their reactions will always sever the
> chain of causation between an officer's initial actions and a
> subsequent use of force. If a plaintiff produces competent evidence
> that persons who have certain illnesses or who are under the
> influence of certain substances are likely to respond to particular
> police actions in a particular way, that may be sufficient to create a
> jury issue on causation. And of course, nothing we say today should
> discourage police departments and municipalities from devising and
> rigorously enforcing policies to make tragic events like this one less
> likely.

*Id.* at 352–53.

Although the Third Circuit rejected the viability of the *Johnson* plaintiff's claim at the

summary judgment stage and based on a lack of proximate causation, this Court finds the Third

Circuit's admonition instructive at the pleadings stage as to the reasonableness of Officer Arnold's

actions. First, whether it was inappropriate or unreasonable for Officer Arnold to decline to wait

for backup depends on "the severity and immediacy of the threat and any potential risk to public

safety posed by an officer's delayed action." *Id.* Here, Ms. Peña alleges that until Officer Arnold

arrived, Mr. Muñoz was unarmed, and his sister had informed the 911 operator accordingly. To

the extent that Defendants suggest that, based on prior interactions with Mr. Muñoz or yet-

undisclosed communications with the dispatcher, Officer Arnold acted with haste because he was

concerned that Mr. Muñoz *was* in fact armed or otherwise threatened public safety, those

allegations represent material issues of fact.  Second, Ms. Peña alleges that Officer Arnold's unaccompanied approach violated law enforcement policies and precluded potential de-escalation techniques, as contemplated by the *Johnson* court.  Again, to the extent that Defendants argue that Officer Arnold's conduct complied with police policies, that represents a material issue of fact. Although Mr. Muñoz's subsequent actions certainly threatened Officer Arnold's life, the Court will not presume that Mr. Muñoz was "so inherently unpredictable" that his actions would not have differed had Officer Arnold waited for backup and pursued de-escalation.  *Johnson*, 837 F.3d at 353.

For these reasons, the Court finds that the pleadings, when construed in favor of Ms. Peña, sufficiently allege that Officer Arnold acted unreasonably by approaching Ms. Peña's home, without waiting for backup, to confront a then-unarmed individual suffering from a mental health crisis.  Defendants' allegations to the contrary represent material issues of fact that preclude judgment on the pleadings as to this element of the qualified immunity analysis.

## 2.  Whether the Constitutional Right Was "Clearly Established"

The U.S. Supreme Court has explained that "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  This Court, in identifying such a right, should not formulate it "as a broad general proposition," but rather must consider "the specific context of the case," as "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."  *Id.* (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam), and then quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).  In other words, the U.S. Supreme Court "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond

debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" or despite "notable factual distinctions . . . so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997))).

Defendants suggest that the "clearly established" rule here is that "deadly force is constitutionally permitted when a suspect is wielding a knife in a threatening manner." (Defs.' Br. 13.) This framing does not comport with the U.S. Supreme Court's guidance to consider the specific context of the case and avoid general propositions. As explained above, a slew of circumstances preceding the shooting bear on the excessive force claim in this case. Ms. Peña, on the other hand, declines to identify a particular right (*see* Pl.'s Br. 13) and instead rests on the fact that any context-specific right will require analysis of Officer Arnold's training and knowledge of the situation—circumstances that, as this Court explained above, are rife with material disputes between the parties. Third Circuit precedent, however, makes clear that even when the pleadings are construed in Ms. Peña's favor—*i.e.*, Officer Arnold believed that Mr. Muñoz was unarmed; police policies counseled waiting for backup in such a scenario; and Officer Arnold's approach of Ms. Peña's house unreasonably escalated the situation to a point where deadly force became necessary—Officer Arnold did not violate any "clearly established" right.

In *Abraham*, the Third Circuit considered conflicting circuit court rulings concerning liability for officers "based on their lapses in following police department procedures, even though those lapses may have contributed to the use of force." 183 F.3d at 295. The Third Circuit expressly "le[ft] for another day how these cases should be reconciled." *Id.* at 296. A few years later, albeit in the context of jury instructions, the Third Circuit again acknowledged that it had not adopted the doctrine that "an officer acts unreasonably if his improper conduct creates the situation

making necessary the use of deadly force." *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 127 (3d Cir. 2003).  Then, in *Neuburger v. Thompson*, the Third Circuit cited the *Abraham* court's ambivalence to conclude that the plaintiff had not "allege[d] the violation of a clearly established constitutional right."  124 F. App'x 703, 706–07 (3d Cir. 2005).

Finally, the Third Circuit's guidance in *Johnson*, summarized above, counseled this Court to weigh Officer Arnold's decision to proceed without backup against factors such as "the severity and immediacy of the threat and any potential risk to public safety posed by an officer's delayed action."  837 F.3d at 353.  The *Johnson* court further advised that "[i]t may also be appropriate for the officer to attempt to de-escalate an encounter to eliminate the need for force or to reduce the amount of force necessary to control an individual," and that "nothing we say today should discourage police departments and municipalities from devising and rigorously enforcing policies to make tragic events like this one less likely."  *Id.*  Although this Court deployed these principles to find that the present pleadings, when construed in Ms. Peña's favor, sufficiently allege the violation of a constitutional right (or, at the very least, reflect material issues of fact that preclude judgment on the pleadings as to that prong), it does not follow from this general guidance that the Third Circuit in *Johnson* had *clearly established* a right not previously endorsed in *Abraham*, *Grazier*, or *Neuburger*.  Indeed, because of the "exceptional circumstances" presented by the facts in *Johnson*, the Third Circuit *declined* to apply its guidance to the very case before it.

Accordingly, this Court cannot say that the Third Circuit has "clearly established" that a police officer violates the constitutional rights of an individual experiencing a mental health crisis when that officer fails to wait for backup—potentially in contravention of police policies—and that decision contributes to the need for deadly force.  *Cf. Wilson v. Borough of Bellmawr*, 2016 WL 7377114, at *13 (D.N.J. Dec. 20, 2016) (holding that officers confronting a suicidal man—who was armed with a knife and barricaded in his room—did not violate any clearly established

right by declining to wait for a SWAT team to arrive).  Notwithstanding this Court's finding that Ms. Peña has sufficiently pleaded that Officer Arnold violated Mr. Muñoz's constitutional rights, this Court cannot, on its own, decree those rights to be clearly established.  For that reason, Officer Arnold is entitled to qualified immunity as to the shooting of Mr. Muñoz, and the Court must dismiss Count I.

### C.   Material Issues of Fact Preclude Judgment on the Pleadings as to the Individual Defendants in Count IV

Ms. Peña alleges that following the shooting, which occurred at around 4:00 p.m., several police officers other than Officer Arnold arrived at the scene and not only failed to provide Mr. Muñoz with medical care themselves but also allegedly prevented the provision of such care by canceling an ambulance that was already *en route*.  (Compl. ¶ 64.)  Ms. Peña further claims that the officers took this action despite that her neighbors pleaded with them to call an ambulance and attempt to save Mr. Muñoz's life.  (*Id.* ¶ 65.)  According to the coroner, Mr. Muñoz died at 6:35 p.m.  (*Id.* ¶ 66.)  Based on the gap between Mr. Muñoz's shooting and time of death, Ms. Peña reasons that Defendants had over two hours to attempt to provide medical care to Mr. Muñoz (*id.* ¶ 67) and that their failure to do so amounts to deliberate indifference to Mr. Muñoz's medical needs (*id.* ¶102). Consequently, Count IV of the Complaint brings a claim against Officer Arnold, Chief Berkihiser, and the City for this alleged denial of medical assistance.

As to Officer Arnold, the Third Circuit has held that "[d]eliberate indifference to the medical needs of arrestees violates their Fourteenth Amendment right to due process." *Smith v. Gransden*, 553 F. App'x 173, 177 (3d Cir. 2014).  To succeed on such a claim, "a plaintiff must show (i) a serious medical need, (ii) acts or omissions by law enforcement officials that indicate deliberate indifference to that need, and (iii) a causal connection between the indifference and the plaintiff's injury." *Id.* (cleaned up).  Defendants do not contest the first element but argue instead

that Officer Arnold immediately requested medical care for Mr. Muñoz (Answer ¶ 67), approached Mr. Muñoz with the other unknown officers and determined that Mr. Muñoz had died shortly after the shooting (a finding later corroborated by a fire department EMT that arrived in the meantime (*id.* ¶ 65)), and only canceled the ambulance *en route* after making this determination (*id.* ¶ 64). Defendants fail to address the significance, if any, of the coroner's determination that Mr. Muñoz died at 6:35 p.m.

For this particular claim, there is perhaps no issue of fact more material than Mr. Muñoz's time of death: if it occurred shortly after the shooting, then the window for assessing the officers' alleged indifference to Mr. Muñoz's medical needs narrows significantly, and the decision to cancel the ambulance call may not reflect deliberate indifference. *Cf. Sullivan v. Warminster Twp.*, 765 F. Supp. 2d 687, 702–03 (E.D. Pa. 2011) (no deliberate indifference where officers "expedited an ambulance" to treat an individual suffering from gunshot wounds). The parties' pleadings and briefing reflect significant dispute as to this circumstance, however, and the coroner's alleged determination is neither attached to the Complaint nor addressed by Defendants. On this disputed record, judgment on the pleadings for Count IV is inappropriate.

As to Chief Berkihiser, this Court explained above two theories of supervisory liability that may apply in this case: (1) "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm'"; and (2) "a supervisor may be personally liable under § 1983 if he . . . , as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K.*, 372 F.3d at 586. Ms. Peña, who focuses on a pattern of excessive force violations (Compl. ¶¶ 55–58), does not appear to allege that, under the second above theory, Chief Berkihiser knew of denial-of-care violations. She has, however, alleged that Officer Arnold and other responding officers

lacked sufficient medical training under the relevant policies and practices (Compl. ¶¶ 64, 104), that this deficiency led to an unlawful denial of medical care (*id.* ¶ 64), and that Chief Berkihiser had the power to correct such deficiencies but, with deliberate indifference, failed to do so (*id.* ¶ 11). Accordingly, she has stated a claim for liability as to Chief Berkihiser under at least one of the theories of supervisory liability.[5] The Court addresses the City's liability in section II.E. below.

### D.    Except for the Negligent Hiring Claim, Ms. Peña Has Stated Grounds for Relief in Count V

Count V asserts a claim of negligent hiring, training, supervision, and monitoring against the City, the County (now dismissed from this case), and Chief Berkihiser. Because the City's liability is addressed below, the Court addresses only Chief Berkihiser here. At the outset, the Court notes that although Ms. Peña frames these claims as sounding in negligence, "ordinary negligence cannot support a § 1983 action," which instead must be supported by deliberate indifference or gross negligence. *Hill v. Borough of Coaldale*, 2008 WL 11502049, at *6 (M.D. Pa. Sept. 8, 2008) (gathering cases).

Turning to the portion of this Count directed to the hiring of Officer Arnold, the Court finds that it must dismiss this basis for relief. To satisfy the deliberate indifference required to hold Chief Berkihiser (or the City, for that matter) liable, Ms. Peña must show that "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997); *see also id.* at 412 (culpability "must depend on a finding that *this* officer was

---

[5]    None of the Defendants have claimed qualified immunity for this alleged violation of Mr. Muñoz's constitutional rights.

highly likely to inflict the *particular* injury suffered by the plaintiff"). Ms. Peña has offered no allegations concerning Officer Arnold's background, and accordingly she has failed to plead a claim relating to his hiring. This deficiency likewise precludes finding liability for Chief Berkihiser on the second supervisory theory that he, "as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K.*, 372 F.3d at 586.

Ms. Peña's claims concerning insufficient training and supervision, however, survive as to Chief Berkihiser. As discussed above, she has alleged that police leadership (presumably including Chief Berkihiser) knew of constitutionally deficient policies and practices (*see* Compl. ¶¶ 50–62), failed to correct them, and implicitly or explicitly approved of them. She has likewise tied these deficiencies to her son's death. Ms. Peña, therefore, has stated a claim against Chief Berkihiser under his supervisory liability.[6]

### E.     Counts II, IV, V, and XI Survive as to the Liability of the City under *Monell*

In Counts II, IV, V, and XI, Ms. Peña seeks to establish liability under section 1983 arising from the shooting of Mr. Muñoz (Count II), the denial of medical care thereafter (Count IV), the deficient training and supervision practices of the police department (Count V), and the unlawful detention of Ms. Peña following the shooting (Count XI). Having addressed the liability of

---

[6]     Defendants argue that the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") also precludes Ms. Peña's claim for negligent hiring, training, supervision, and monitoring. (Defs.' Br. 27.) The PSTCA, however, "does not affect § 1983 claims." *Thomas v. Cnty. of Chester, Pocopson Home*, 312 F. Supp. 3d 448, 452 n.26 (E.D. Pa. 2018) (gathering cases). Although Count V does not expressly mention section 1983, it links the relevant training and supervision practices to "the deprivation of [Mr. Muñoz's] constitutional rights under the Fourth and/or Fourteenth Amendments to the U.S. Constitution." (Compl. ¶ 110.) Accordingly, the Court declines to construe Count V as a common law or state law negligence claim that the PSTCA would bar.

individual defendants above,[7] the Court now considers whether Ms. Peña can maintain these claims against the City.

### 1.      Elements of *Monell* at the Pleadings Stage

In *Monell*, 436 U.S. at 690, the U.S. Supreme Court held that plaintiffs may bring section 1983 claims against municipalities and other local government units if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell* liability may also extend to a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."  *Id.* at 691.  Liability will not extend to a municipality, however, "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.*

The Third Circuit has explained that "a § 1983 claim against a municipality may proceed in two ways.  A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice."  *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (cleaned up).  Plaintiffs pursuing the first theory must either "point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the relevant subject" or, if alleging a custom, "evince a given course of conduct so well-settled and permanent as to virtually constitute law."  *Id.* at 105–06.

The second theory—which encompasses claims involving a failure to train and "other failures and inadequacies by municipalities, including those related to supervision and discipline

---

[7]      Defendants did not argue that Ms. Peña failed to state a claim against the unknown police officers who arrested her after the shooting of her son (Count XI), and accordingly the Court considers only whether Count XI survives as to the City.

of its police officers," *see id.* at 105—requires "demonstrating a failure or inadequacy amounting to deliberate indifference on the part of the municipality," *see id.* at 106; *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 387–89, 391 (1989) (*Monell* liability for failure to train officers may attach in "limited circumstances"—namely, "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and the deficient training is "closely related to the ultimate injury").  Plaintiffs may establish deliberate indifference by showing "whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)); *see also Connick v. Thompson*, 563 U.S. 51, 62–64 (2011) ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights," but "in a narrow range of circumstances," a plaintiff may also pursue "single-incident" liability where "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.").

Establishing these elements is often a tall task for plaintiffs and, generally, requires both "a plaintiff to plead facts outside his or her personal knowledge" and a court to examine "matters beyond the pleadings, a task which cannot be undertaken in the context of a motion to dismiss." *3909 Realty LLC v. City of Philadelphia*, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021).  For those reasons, the Third Circuit has held that an "insistence that [the plaintiff] must identify a particular policy and attribute it to a policymaker, at the pleading stage without benefit of discovery, is unduly harsh."  *Carter*, 181 F.3d at 357–58.

## 2. Whether a Lack of Primary Liability Precludes Municipal Liability

Defendants argue that for liability to attach to the City, "Plaintiff must first establish that one of its employees is primarily liable under § 1983." (Defs.' Br. 23.) Because this Court found that Officer Arnold is entitled to qualified immunity as to the shooting of Mr. Muñoz, Defendants would have the Court find that there can be no *Monell* liability for the City as well for purposes of Count II.

The case law on this point is not as clear as Defendants would have it. One the one hand, the Third Circuit has held that because the *Monell* court rejected municipal liability on a theory of *respondeat superior*, a municipality "cannot be vicariously liable under *Monell* unless one of [its] employees is primarily liable under section 1983 itself." *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 467 (3d Cir. 1989). But on the other hand, a lack of primary liability for a police officer would not necessarily preclude finding, pursuant to *Monell*, that a municipality maintained a policy or custom that resulted in a constitutional violation, and the Third Circuit has since recognized as much. *See Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) ("The precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independently of the section 1983 claims against the individual police officers, as the City's liability for a substantive due process violation does not depend upon the liability of any police officer."); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1062–63 (3d Cir. 1991) (explaining that *Monell* requires a kind of primary liability as to a "high-level official" with policymaking authority but *not* as to a "low-level employee," such as Officer Arnold here).

Further complicating the picture, certain courts in this District have endorsed the view—shared by various circuit courts but not addressed by the Third Circuit—that "[i]f the right at issue is not 'clearly established' [for purposes of qualified immunity], then any assertion of deliberate indifference is substantially undercut because, by definition, there are no 'clear constitutional

guideposts' for the municipality to follow in developing policy."  *Lewis v. City of Philadelphia*, 2020 WL 1683451, at *12 (E.D. Pa. Apr. 6, 2020) (quoting *Harris*, 489 U.S. at 397 (O'Connor, J., concurring)); *accord Outlaw v. City of Philadelphia*, 2021 WL 3471168, at *8 (E.D. Pa. Aug. 6, 2021).  This Court agrees that the lack of a clearly established right "undercuts" the likelihood that a municipality was deliberately indifferent to that right, but the Court will not treat such a lack as a *per se* bar to *Monell* liability.

### 3. Whether Ms. Peña Has Sufficiently Pleaded *Monell* Liability

In her Complaint, Ms. Peña makes the following allegations about City policies and customs that lead to constitutional violations for excessive force:  the City "operated a dysfunctional disciplinary system for Lancaster Police officers accused of serious misconduct" because it "almost never imposes significant discipline against police officers accused of violating the civil and constitutional rights of members of the public" and lacks any "mechanism for identifying police officers who are repeatedly accused of engaging in misconduct" (Compl. ¶ 50); the City investigates excessive force claims in-house or through the local district attorney rather than through an independent entity (*id.* ¶ 51); the foregoing policies or customs "embolden[]" officers "to act with impunity to violate the constitutional and civil rights of citizens" (*id.* ¶ 52); the City "has deficient policies and practices regarding officer supervision and training" because it has inadequately structured officer supervision and failed to invest in it sufficiently (*id.* ¶¶ 53–54); and, finally, the City's use-of-force policies insufficiently provide for less-than-lethal tactics, de-escalation tactics, and strategies particular to individuals suffering from a mental health crisis (*id.* ¶ 106).  Ms. Peña also points to two lawsuits involving alleged excessive force (*id.* ¶¶ 55–57) and comments by the then-Mayor of Lancaster acknowledging the legitimacy of certain unspecified lawsuits (*id.* ¶ 59).  Ms. Peña claims that there have been additional lawsuits based on

constitutional violations and that the City has "paid millions of dollars to settle excessive-force lawsuits," though Ms. Peña does not provide citations for these allegations.

When referring to Defendants' customs and training relating to medical care, Ms. Peña alleges that the unknown police officers responding to the shooting "had no special medical training" and consequently "failed to provide [Mr. Muñoz] with necessary medical attention." (Compl. ¶¶ 64, 101.) Ms. Peña faults this lack of training for also causing the officers to "intervene[] to prevent [Mr. Muñoz] from getting emergency medical attention by cancelling the ambulance that had previously been dispatched to the scene." (*Id.* ¶ 64.)

Defendants largely deny these allegations, citing "extensive policies and progressive training in a number of relevant areas to include policies regarding use of force, first aid, de-escalation, and welfare checks." (Answer ¶ 50.) Such policies and training include "use of force training and CPR and first aid training." (*Id.* ¶ 52.) Defendants also detail the police department's internal complaint-tracking software, called IAPro, as well as both internal and external supervision (the latter including independent entities such as the Lancaster County District Attorneys' Office, the Pennsylvania State Police, and the City's own internal affairs team). (*Id.* ¶¶ 50–51.) Finally, Defendants dispute the significance of the lawsuits referenced by Ms. Peña on the grounds that "[o]ver the past three (3) years only eleven (11) incidents have resulted in litigation out of the approximately 141,000 calls responded to by the Bureau (0.000078%, or 1 out of every 12,819), and none have resulted in a finding by the Court, or a jury, that the City or its officers violated the constitutional rights of the litigant." (*Id.* ¶ 58.) Defendants likewise note that "Officer Arnold has never been named as a defendant in any lawsuit, nor received a single citizen complaint since he became an officer at the Bureau." (*Id.*)

Ms. Peña's claims "sound[] in both" the "policy-and-custom" theory and the "failure-or-inadequacy" theory. *Forrest*, 930 F.3d at 106. In Count II, for example, she has alleged a custom

of impunity in cases of excessive force due to a dysfunctional disciplinary system and underfunded supervisory apparatus, and such allegations also support a claim of failure to adequately train police officers concerning use-of-force guidelines.  Count V likewise alleges both deficient customs and training concerning less-than-lethal tactics, de-escalation tactics, and mental health crisis strategies.  The allegations pertaining to Count IV, the alleged denial of medical care, arguably focus only on a failure to train police officers in first aid, but Ms. Peña has at least mentioned that "policies and practices" also contributed to the denial of care.  As to Count XI, regarding the unlawful detention of Ms. Peña, the Court construes her allegations about deficient training and disciplinary review to also apply to improper arrests and detentions.  Indeed, Ms. Peña cites a case in which another individual was arrested by being pushed up against a vehicle, causing her injuries.  (*Compare id.* ¶ 57 (describing that lawsuit) with *id.* ¶¶ 139–40 (detailing Ms. Peña's allegedly unlawful arrest and detention)).

Defendants, in response, have pointed to their extensive training programs, their complaint-tracking software, and a general lack of judgments against the police for constitutional violations. At the present stage of this case, however, Ms. Peña has not been able to investigate through discovery the sufficiency of Defendants' training, disciplinary system, and supervision.  As in *Carter*, Ms. Peña "is not engaged in a mere fishing expedition."  181 F.3d at 358.  Instead, she claims that the potential deficiencies in how the City responds to its citizens' mental health crises allegedly caused the death of her son.  Accordingly, judgment on the pleadings is inappropriate for Counts II, IV, V, and XI.

### F.      The PSTCA Does Not Bar Counts VI, VII, X, and XII

In Counts VI, VII, X, and XII, Ms. Peña alleges various intentional torts, including wrongful death, intentional infliction of emotional distress, and two counts of battery (for the shooting of Mr. Muñoz and police officers' subsequent contact with Ms. Peña herself).  She brings

these claims under Pennsylvania law and without reference to the deprivation of constitutional or federal rights, and because these are therefore not section 1983 claims, the Court must consider the effect of the PSTCA.

Certain of these counts were brought against not just the individual officers but also the City, and considering that the PSTCA precludes municipal liability both for intentional torts and negligence (subject to exceptions not applicable here), *see* 42 Pa. Stat. and Cons. Stat. Ann. §§ 8541, 8542(a)(2), Ms. Peña has withdrawn those claims against the City.  She contends, however, that she has sufficiently pleaded that the individual officers acted with the requisite "actual malice or willful misconduct" that deprives them of immunity under the PSTCA.  *Id.* § 8545 (providing employees with the same immunity afforded to local government); *id.* § 8550 (providing exceptions to such immunity).  Courts have explained that "willful misconduct is a demanding level of fault," and accordingly, "the conduct of a police officer will only constitute willful misconduct if the officer committed misconduct which the perpetrator recognized as misconduct and which was carried out with the intention of achieving exactly that wrongful purpose."  *Sullivan*, 765 F. Supp. 2d at 707 (cleaned up) (first quoting *Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006), and then quoting *Waldon v. Borough of Upper Darby*, 77 F.Supp.2d 655, 658 (E.D. Pa. 1999)).  The requisite intent is also present if the officer "was aware that [the desired result] was substantially certain to ensue."  *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1023 (Pa. Commw. Ct. 2014).

Counts VI and VII bring claims of battery and wrongful death relating to the shooting of and denial of care to Mr. Muñoz.  (The battery claim applies to Officer Arnold only; the wrongful death claim, to all Defendants other than the City.)  Although this Court found above that, based on the pleadings, Officer Arnold acted unreasonably in approaching Ms. Peña's home, that does not equate to finding that he acted with willful misconduct.  *See Sullivan*, 765 F. Supp. 2d at 707–

08 ("[W]hen courts analyze the actions of police officers, the gulf between unreasonable conduct and willful misconduct is a large one.").  Ms. Peña, however, has also alleged that Officer Arnold knew that Mr. Muñoz "was experiencing a mental-health crisis," that he was not armed (at least at the time of the 911 call), and that police guidelines required Officer Arnold to wait for backup and pursue de-escalation tactics.  (Compl. ¶¶ 39, 41–42.)  Ms. Peña also alleges that Officer Arnold and other police officers intervened to prevent medical attention despite having no special medical training.  (*Id.* ¶ 64.)  These allegations state a plausible claim that the officers engaged in misconduct knowing that the allegedly wrongful outcome in this case was substantially certain to ensue.  Likewise, the Court found above that Ms. Peña has sufficiently pleaded Chief Berkihiser's deliberate indifference to police policies and practices that allegedly violate individuals' constitutional rights, and for those same reasons, she has provided allegations sufficient to remove Chief Berkihiser from PSTCA immunity.  Defendants, of course, vehemently deny these allegations, but at most, such denials preclude judgment on the pleadings.

Counts X and XII arise from injuries suffered by Ms. Peña herself and assert claims of intentional infliction of emotional distress and battery.  (Following Ms. Peña's withdrawal of certain claims as to the City, Count X applies to Officer Arnold; Count XII, to unknown police officers.)  Because the alleged emotional distress suffered by Ms. Peña represents another substantially certain result of the alleged misconduct discussed above, the Court finds that PSTCA immunity does not apply.  Likewise, Ms. Peña alleges that after the shooting of her son, "various police officers tackled Plaintiff, Miguelina Peña, against a police vehicle, which resulted in serious bruising on her leg." (Compl. ¶ 148.)  At this early stage in litigation, the Court views the restraint of Ms. Peña as a substantially certain outcome of the shooting of her son, and because the Court has found that such shooting, as pleaded, involved willful misconduct, the Court declines to apply PSTCA immunity to Count XII at this time.

Finally, although Defendants raised the issue of PSTCA immunity in their briefing, they have not argued that Ms. Peña has failed to set forth each claim's substantive elements. Accordingly, because the Court has rejected the application of PSTCA immunity for all Defendants other than the City, Counts VI, VII, X, and XII survive Defendants' Motion.[8]

## G.      Judgment on the Pleadings is Inappropriate as to Count IX

The last remaining claim, Count IX,[9] seeks relief from the City pursuant to the Americans with Disabilities Act ("ADA").  The Third Circuit has applied the ADA to police officers making an arrest of an individual with a disability.  *Haberle v. Troxell*, 885 F.3d 170, 180 (3d Cir. 2018). To state claim under that law, a plaintiff must satisfy four elements: "(1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."  *Id.* at 178 (quoting *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 n.32 (3d Cir. 2007)).  Defendants assert that Ms. Peña has failed to establish the third of these elements.  The Third Circuit has explained that the requisite discrimination "includes failing to make reasonable accommodations for a plaintiff's disabilities." *Id.* at 180 (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

As Defendants point out, however, because such accommodations must be *reasonable*, the presence of exigent circumstances may reduce or altogether eliminate any possibility of

---

[8]      The Court notes that its grant of qualified immunity to Officer Arnold does not bear on the state law claims asserted against him, as "qualified immunity is a defense only to violations of federal law under § 1983.  Immunity from state law claims is governed by the state's immunity doctrine."  *El v. City of Pittsburgh*, 975 F.3d 327, 334 n.3 (3d Cir. 2020) (citing *In re City of Philadelphia Litig.*, 49 F.3d 945, 957 (3d Cir. 1995)).

[9]      Ms. Peña agreed to withdraw Count VIII concerning alleged violations of Pennsylvania civil rights law.

accommodation.  (Def.'s Br. 18–19 (gathering cases).)  In particular, Defendants rely on a Sixth

Circuit case in which police responded to an individual with an intellectual disability who had

threatened his father with a machete.  *Thompson v. Williamson Cnty., Tennessee*, 219 F.3d 555,

556 (6th Cir. 2000).  Police were informed of the weapon and the family's desire that the individual

be transported to a hospital.  *Id.*  When an officer confronted the individual and ordered him to

drop his weapon, the individual instead approached the officer and raised the machete as though

he were preparing to throw it at the officer, after which the officer shot and killed him.  *Id.*

This case and others may support the proposition that a "reasonable" accommodation in

emergency situations may be limited or no accommodation at all.[10]  Such cases, however, differ

from the pleadings in the present one.  Here, Ms. Peña alleges that Mr. Muñoz's sister informed

the 911 operator that Mr. Muñoz dealt with mental illness, that "there were no weapons, drinking,

or drug use involved" in the emergency, and that the family "simply needed help 'with you

bringing [Mr. Muñoz] to the hospital.'"  (Compl. ¶¶ 38–40.)  She also claims that a dispatcher

provided Officer Arnold with this same information as he was *en route* to Ms. Peña's home.  (*Id.*

¶ 41.)  In this version of events, Officer Arnold is not responding to circumstances as exigent as

those in *Thompson*; instead, at this point, it remained an option for Officer Arnold to await backup

and develop a plan to deescalate the situation—in other words, pursue a reasonable

accommodation of Mr. Muñoz's mental health emergency.  Only *after* Officer Arnold approached

the home and Mr. Muñoz ran toward him with a knife does this case come to resemble *Thompson*.

To be sure, another plausible version of events is that Officer Arnold, while *en route*, was in fact

---

[10]    The Court notes, however, that the Sixth Circuit rested its decision on the fourth element,
not the third.  The Sixth Circuit reasoned any discrimination or denial of medical services (under
the third element above) was by reason of the individual's "violent, threatening behavior,"
*Thompson*, 219 F.3d at 558, not "by reason of his disability" (pursuant to the fourth element).

informed that Mr. Muñoz was armed or otherwise threatening the safety of others.  Officer Arnold

may also have been aware of prior incidents with Mr. Muñoz, including one allegedly consisting

of an "unprovoked attack involving a knife."  (Answer ¶¶ 32–34.)  These allegations, however,

represent material issues of fact and therefore preclude judgment on the pleadings.[11]

### H.    Punitive Damages

For claims under section 1983, "a jury may be permitted to assess punitive damages . . .

when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves

reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461

U.S. 30, 56 (1983).  That said, municipal entities such as the City here are immune from punitive

damages.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).  But contrary to

Defendants' cursory assertion (Defs.' Br. 30), Ms. Peña has indeed alleged that Officer Arnold

acted with "reckless indifference to [Mr. Muñoz's] constitutional rights" in denying him medical

care (Compl. ¶ 102) and that Chief Berkihiser acted with "deliberate indifference" to the

deficiencies in police policies and practices (*id.* ¶ 109–10).  Accordingly, the Court will not reject

the possibility of punitive damages at this time.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is granted in part and denied in part.  A

corresponding order accompanies this memorandum.

---

[11]    The Court likewise declines to find that compensatory damages are unavailable under the
ADA.  To recover such damages, a plaintiff must provide "proof of 'intentional discrimination,'"
which, in turn, requires showing deliberate indifference.  *Haberle*, 885 F.3d at 181 (quoting *S.H.
ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013)).  The Court has
already decided that judgment on the pleadings is inappropriate for Ms. Peña's *Monell* claims,
which also depend in part on that same showing of deliberate indifference.  Accordingly, judgment
on the pleadings is inappropriate here as well.