# TABLE OF CONTENTS

1. **Ricardo Muñoz's Early Life and Diagnosis of Schizophrenia**
.................................................................................................... 2

2. **Mr. Muñoz's Twenty-Six (26) Documented Encounters with LCBP Before September 2020**
....................................................................................................8

3. **The LCBP Provided No Accommodations or Systems for Repeated Encounters with Individuals with Mental Health Disabilities Before September 2020**
....................................................................................................5

4. **September 13, 2020: The Shooting & Death of Mr. Muñoz**
   - Rulennis Muñoz's Calls to LCBP's Non-Emergency Line
.................................................................................................... 8
   - Debrah Muñoz's 911 Call
.................................................................................................... 19
   - Officer Arnold's Response
.................................................................................................... 22
   - Events Immediately Following the Shooting
.................................................................................................... 24

5. **No Exigent Circumstances Existed That Required Officer Arnold to Rush His Response**
.................................................................................................... 27

6. **Failure to Provide Medical Care After the Shooting**
.................................................................................................... 30

7. **Inadequate Training**
   - Officer Arnold's Training at the Police Academy
.................................................................................................... 37
   - Officer Arnold's Training at the LCBP
.................................................................................................... 39

○ LCBP's Failure to Implement a Law-Enforcement-Based Crisis Intervention Team
.................................................................................................. 42

○ Lack of Training Involving Medical Emergencies
.................................................................................................. 47

8. **Inadequate Supervision**
.................................................................................................. 49

9. **Inadequate Policies & Procedures**
.................................................................................................. 53

10. **LCBP's History of Using Excessive Force and Denying Medical Care**
.................................................................................................. 59

11. **No Independent Investigations**
.................................................................................................. 70

12. **No Meaningful Discipline**
.................................................................................................. 72

13. **The LCBP's Failure to Meaningfully Comply with the Americans with Disabilities Act**

○ The City/LCBP Are Required to Meaningfully Comply with the ADA
.................................................................................................. 76

○ The LCBP/The City Have Failed to Create Programs or Make Accommodations that Meaningfully Benefit People with Disabilities
.................................................................................................. 77

○ Police Officer Lack Knowledge and Training about their Duties Under the ADA
.................................................................................................. 81

○ The LCBP/The City Failed to Provide Mr. Muñoz with Reasonable Modifications to Accommodate His Disability
.................................................................................................. 82

○ A Different Response Was Possible That Would Have Preserved Mr. Muñoz's Life
.................................................................................................. 84

14. **Defendants' Unlawful Detention of Ms. Peña**

    o  LCBP Officers Collectively Decided to Detain Ms. Peña Without Justification

    ........................................................................................... 86

    o  Ms. Peña was detained against her will

    ........................................................................................... 86

    o  LCBP Officers Had No Probable Cause to Detain Ms. Peña

    ........................................................................................... 90

    o  Ms. Peña was not informed of her rights

    ........................................................................................... 91

    o  Officers at the LCBP Customarily Detain Citizens Without Probable Cause

    ........................................................................................... 92

    o  LCBP Supervisors Are Aware of, Approve, and Fail to Supervise Detention Practices

    ........................................................................................... 95

15. **Defendants' Battery Against Ms. Peña**

    ........................................................................................... 96

16. **Defendants Caused Ms. Peña to Suffer Extreme Emotional Distress**

    ........................................................................................... 97

17. **Conclusion**

    ...........................................................................................97

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Miguelina Peña, Individually and as Independent Administrator of the Estate of Ricardo Muñoz, now deceased,**<br><br>**Plaintiff,**<br><br>vs.<br><br>**City of Lancaster, a municipal corporation; Jarrad Berkihiser, in his individual and official capacity as Chief of Police for the City of Lancaster; Karson Arnold, in his individual and official capacity as a police officer for the City of Lancaster; County of Lancaster, Pennsylvania; Unknown Police Officers,**<br><br>**Defendants.** | **Court No: 5:21-cv-00590**<br><br>**Judge Jeffrey L. Schmel** |

### PLAINTIFF'S STATEMENT OF
### ADDITIONAL MATERIAL FACTS

Plaintiff submits the following statement of additional material facts. As outlined in Plaintiff's Motion to Strike Defendant's so-called "Joint" Statement of "Undisputed" Facts, Plaintiff does not agree to the Defendants' narrative presentation. While Plaintiff does not dispute some of the facts offered by Defendants, Defendants failed to include necessary context. Plaintiff's Statement of Material Facts provides the context to support each cause of action and to fully understand the circumstances leading to Mr. Muñoz's death.

## RICARDO MUÑOZ'S EARLY LIFE AND
## DIAGNOSIS OF SCHIZOPHRENIA

1.      Growing up, Mr. Muñoz was calm and well-adjusted. Although he faced some bullying, teachers described him as "a very calm, normal boy" who "never had any types of problems." (Trial Exhibit #181 – R. Muñoz Dep., 17:1-11; Trial Exhibit #180 – Peña Dep., 57:23-58:1.) He was "very sweet" and well-liked by his classmates. (Trial Exhibit #180 – Peña Dep., 113:15-23.)

2.      In high school, he earned a mix of As, Bs, and Cs, with one D and only one absence during the school year. (Trial Exhibit #22 – Eastern Lancaster School Records, p.8/12.) Mr. Muñoz enjoyed activities such as playing on his Xbox and had a strong interest in cars. (Trial Exhibit # 181 – R. Muñoz Dep.,86:22-23.) Rulennis Munoz testified Mr. Muñoz was quiet, shy, and well-behaved at school, with no concerns about his behavior toward others. (Trial Exhibit #180 – R. Muñoz Dep., 86:24-87:9.)

3.      Following in his big sister's footsteps, Mr. Muñoz participated in track and field from his sophomore through senior years and joined the cross-country team in his junior year. For his senior project, he completed 40 hours of work with a chiropractor. (Trial Exhibit #23b – Thadeus Stevens College, p.14/23.)

4.      After graduating high school, Mr. Muñoz enrolled at Thaddeus Stevens College of Technology in August 2014 to pursue a degree in Automotive Technology & Collision Repair Technology. (Trial Exhibit #180 – Peña Dep., 11:21-23; Trial Exhibit #23b – Thadeus Stevens College, p.8/23.)

5.      Mr. Muñoz's mental health problems began when he went to college. (Trial Exhibit #181 – R. Muñoz Dep., 87:13-16; Trial Exhibit #180 – Peña Dep., 58:7-8.) It was then that his family first started noticing changes in his behavior: he was quieter and did not talk to his family as much. His college roommate reported that Mr. Muñoz was talking to his closet, thinking someone was there. Mr. Muñoz would talk to himself, which the family believed was odd. (Trial Exhibit #181 – **R.** Muñoz Dep., 87:20-23; Trial Exhibit #182 – **D.** Muñoz Dep., 67:11-24.)

6.      Before starting college in August 2014, Mr. Muñoz had never had any encounters with the police. (Trial Exhibit #181 – R. Muñoz Dep., 87:24-88:3.)

7.      It was only after Mr. Muñoz's mental disability began to reveal itself that Mr. Muñoz interactions with the police began. (Trial Exhibit #181 – R. Muñoz Dep., 88:4-88:8.)

8.      Mr. Muñoz was dismissed from Thaddeus Stevens College in May 2015 on allegations that he had violated the College Code of Conduct. (Trial Exhibit #23b – Thadeus Stevens College, MP_0038.) His family explained that the incident leading to his dismissal involved the stalking of a young woman on campus. Mr. Muñoz, already clinically unwell, did not understand the nature of his conduct and did not have the capacity to appreciate the consequences of his actions. His family knew that Mr. Muñoz's actions resulted from his disability. (Trial Exhibit #181 – R. Muñoz Dep., 88:17-21; Trial Exhibit #180 – Peña Dep., 113:2-9.)

9.      Mr. Muñoz tried to work, but he was unable to keep jobs for long. For example, in 2020 Mr. Muñoz worked at Olive Garden cleaning tables, but he lost his

job because he was not able to concentrate, and many times forgot he needed to work. (Trial Exhibit #180 – Peña Dep., 15:17-23.)

10.    "Most of the jobs he couldn't keep because the employer would tell him to work on this certain thing, and he will go work on something else… Some of the places [] let him go because he [would] forget that he had to work." (Trial Exhibit #181 – **R.** Muñoz Dep., 24:16-25:1; Trial Exhibit #182 – **D.** Muñoz Dep., 13:19-22.)

11.    Mr. Muñoz mental illness steadily took a toll on his relationships. Mr. Muñoz had friends in high school but was not able to keep friendships later in his life. (Trial Exhibit #181 – R. Muñoz Dep., 39:12-24; Trial Exhibit #1812– D. Muñoz Dep., 36:12-15.)

12.    At some point, Mr. Muñoz was formally diagnosed with paranoid schizophrenia. He was then institutionalized at psychiatric hospital then called "Regional" (Trial Exhibit #181 – R. Muñoz Dep., 45:13-15; 46:10-18.)

13.    After his diagnosis, Mr. Muñoz was admitted to, and treated at, Lancaster Behavioral Health Hospital. (Trial Exhibit #180 – Peña Dep., 24:21-25:2.) Mr. Muñoz also received mental health treatment at Nyack Hospital in New York. (Trial Exhibit #180 – Peña Dep., 26:9-27:23.)

14.    By 2019, Mr. Muñoz's mental health had deteriorated significantly. His medical records show that his mother reported "he [was] incapable of functioning normally, has to be reminded of his household chores, talks to himself, and at times he laughs for no reason at all." (Trial Exhibit #31 – Nuestra Clinica Records, p.16/17). When Mr. Muñoz was temporarily living with his sister, Rulennis

Muñoz needed to remind him to take showers. (Trial Exhibit #181 – R. Muñoz Dep., 34:5-9.)

15.    Mr. Muñoz was also having "episodes" during which he would become confused, agitated, and would raise his voice. (Trial Exhibit #182 – **D**. Muñoz Dep., 28:12-18.) Even when agitated, Mr. Muñoz was never physically violent toward his family members. (Trial Exhibit #181 – **R**. Muñoz Dep., 47:2-9; Trial Exhibit #182 – **D**. Muñoz Dep., 27:7-16.) Ms. Peña always felt comfortable with Mr. Muñoz being around and playing with his nephews and nieces. (Trial Exhibit #180 – Peña Dep., 114:17-20.) Likewise, Rulennis Muñoz stated that although she had seen Mr. Muñoz become confused and agitated, she always felt comfortable having him in her house and around her children. (Trial Exhibit #181 – R. Muñoz Dep., 125:21-24.)

16.    Ms. Peña testified that Mr. Muñoz was taking medications for his mental health issues. (Trial Exhibit #180 – Peña Dep., 29:5-8.) Although she does not have the records, Ms. Peña believes that around the time of his death, Mr. Muñoz continued to be seen by a mental health provider at Nuestra Clinica. (Trial Exhibit #180 – Peña Dep., 29:19-23.)

17.    Approximate a month before Mr. Muñoz's death, Ms. Peña left the country to care for her dying mother. Ms. Peña testified that in the months before her departure, she would ensure that Mr. Muñoz took his prescribed medications. (Trial Exhibit #180 – Peña Dep., 31:7-12.) She also noted that while she often helped him take his medications, he was capable of taking them independently. (Trial Exhibit #180 – Peña Dep., 32:2-7.)

18.     Rulennis Muñoz believes that her brother was taking his prescribed medications during the last month of his life. (Trial Exhibit #181 – R. Muñoz Dep., 36:16-19.)

19.     Despite his mental health problems, Mr. Muñoz was a beloved member of his family:

> a.  Mr. Muñoz would spend hours watching TV with his sister Debrah Muñoz. The two of them also bonded over their affinity for gospel music and K-pop. (Trial Exhibit #182 – **D**. Muñoz Dep., 64:5-20.)
>
> b.  In 2019, Mr. Muñoz still walked Rulennis Muñoz's dog, would play with his nephews, would help Rulennis Muñoz with the cooking, and would help around the house and do the dishes. (Trial Exhibit #181 – R. Muñoz Dep., 38:8-15.)
>
> c.  Ms. Peña and Mr. Muñoz enjoyed going to the gym, running in the park, and shopping together. (Trial Exhibit #181 – R. Muñoz Dep., 127:19-21.)
>
> d.  Rulennis Muñoz described Mr. Muñoz as bright, lovely, and caring.  He cared about the environment and was always compassionate despite his difficulties. (Trial Exhibit #181 – R. Muñoz Dep., 128:17-23.)

20.     Dr. Lama Bazzi, MD, a Board-Certified Adult and Forensic Psychiatrist, as well as a Board-Certified Addiction Medicine Specialist, opined that Mr. Muñoz suffered from schizophrenia, bipolar disorder, and psychosis, as

documented in his medical records. (Trial Exhibit #228 – Dr. Bazzi Expert Report

p.2-3)

## MR. MUÑOZ'S TWENTY-SIX (26) DOCUMENTED ENCOUNTERS WITH LCBP BEFORE SEPTEMBER 2020

21.     Mr. Muñoz was well known to the LCBP. By 2019, Mr. Muñoz had had **26 *documented* prior** encounters with the LCBP. (Trial Exhibit #26 – Defs.' Production p.105-106.)

22.     Rulennis Muñoz does not recall the exact number of times the family had called 911 in the past, but the LCBP had been to Ms. Peña's home on multiple occasions before September 13, 2020. (Trial Exhibit #181 – R.Muñoz Dep., 97:4-10.)

23.     Although Defendant City has failed to produce each incident report, the available evidence shows that the LCBP was interacting with Mr. Muñoz an average of 5 times per year from 2014-2020. (Trial Exhibit #26 – Defs.' Production, p.105-106.)

24.     Before September 2020, there were at least 14 calls categorized as "domestic disturbance"; "mental health cases"; "assist citizen"; "assist agency" during which Mr. Muñoz's mental health issues were apparent to the LCBP. (Trial Exhibit #26 – Defs.' Production, p.107-109.)

25.     In 2014, Mr. Muñoz had **3 documented encounters** with the LCBP, including for a traffic stop and trespassing. (Trial Exhibit #26 – Defs.' Production, p. 106.)

26.     No plan was created for how to interact with Mr. Muñoz after the initial three encounters starting in 2014:

Q: In 2014, after these three incidents, are you aware of whether there was any type of plan created by the police department as to how they were going to respond to other future interactions with Mr. Muñoz?
A: Are you asking because we interacted with him in -- three times in 2014?
Q: Yes.
A: No.

(Trial Exhibit #187 – Berkihiser Dep., 118:17-119:1.)

27.     On August 19, 2016, Mr. Muñoz had his **5ᵗʰ documented encounter**

with the LCBP. (Trial Exhibit #26 – Defs.' Production, p.112-114).

   a.  LCBP categorized this incident as a "Mental Health Case" (Trial

       Exhibit #26 – Defs.' Production, p.112-115.)

   b.  The responding officers noted that Mr. Muñoz was in the lobby, and he

       was "suffering from mental health issues." (Trial Exhibit #26 – Defs.'

       Production, p.113-114).

   c.  Sgt. Mcloughlin facilitated an involuntary committal. (Trial Exhibit

       #26 – Defs.' Production, p.113-114).

   d.  Ms. Peña believes that after this incident, Mr. Muñoz started to

       become uncomfortable around the police. "I think that maybe he wasn't

       comfortable with the police because one time he thought that someone

       was following him, you know how people with mental problems often

       think that sort of thing. So he went to the police and [he] said that

       someone was following him. So he [went to the police station] and they

       mistreated him…. The brought him to the hospital and admitted him…

       [But] he had bruises on his arms and his back hurt…But the doctors

would not have put those bruises on him while he was admitted."
(Trial Exhibit #180 – Peña Dep., 75-7:76:9.)

e. Rulennis Muñoz testified that Mr. Muñoz had walked to the police
station because he felt that he was being followed by someone that was
going to kill him. During the course of the investigation, the LCBP
officers noticed that Mr. Muñoz was incoherent and not making any
sense. Mr. Muñoz was then handcuffed and taken to the hospital.
(Trial Exhibit #181 – R. Muñoz Dep., 98:9-18.)

28.    On November 6, 2017, Mr. Muñoz had his **13ᵗʰ documented
encounter** with the LCBP. (Trial Exhibit #26 – Defs.' Production, p.105-106.)

a. LCBP categorized this incident as a "Mental Health Case" (Trial
Exhibit #26 – Defs.' Production, p.116-118.)

b. A "302" involuntary commitment was served on Mr. Muñoz, and he
was taken to Lancaster General Hospital for evaluation. (Trial Exhibit
#26 – Defs.' Production, p.118.)

29.    On November 10, 2017, Mr. Muñoz's family called the police for an
incident involving Mr. Muñoz trying to harm himself. This was Mr. Muñoz's **15ᵗʰ
documented encounter** with the LCBP. (Trial Exhibit #26 – Defs.' Production, p.
105-106.)

a. Defendants categorized this encounter as a "domestic disturbance."
(Trial Exhibit #26 – Defs.' Production, p.106.) However, the reason the
family called was because Mr. Muñoz locked himself in his room, was

not eating, and had cut himself.  (Trial Exhibit #180 – Peña Dep., 52:13-23.)

b. Chief Berkihiser testified that he is not aware of any type of assessment done at this time to determine how to handlde future calls involving Mr. Muñoz. (Trial Exhibit #187 – Bekihiser Dep., 125:17-22.)

30.    On March 30, 2018, Mr. Muñoz had his **17th documented encounter** with the LCBP for an alleged "theft." (Trial Exhibit #26 – Defs.' Production, p.105-106.)

a. Ms. Peña testified that Mr. Muñoz had opened up a car, but he did not take anything. (Trial Exhibit #180 – Peña Dep., 56:23-57:15.)

31.    On January 30, 2019, Mr. Muñoz had his **25th documented encounter** with the LCBP. (Trial Exhibit #26 – Defs.' Production, p.105-106.)

a. Officer Hatfield responded to "Assist Agency" (aka EMS response) call during which Mr. Muñoz was taken to the hospital because he had swallowed a bullet. (Trial Exhibit #184 – Hatfield Dep., 121:12-17; Trial Exhibit #26 – Defs.' Production p.120.)

b. Despite his extensive history with the LCBP, Officer Hatfield was unaware of Mr. Muñoz's prior encounters. (Trial Exhibit #184 – Hatfield Dep., 135:6-15; 145:17-146:5.) Officer Hatfield believed that Mr. Muñoz swallowing a bullet was "just something stupid" he had done. (Trial Exhibit #184 – Hatfield Dep., 161:1-9.)

      c.   Even though by this time Mr. Muñoz had had 25 documented prior encounters with the police, the LCBP had no plan in place for how to respond to future incidents involving Mr. Muñoz. (Trial Exhibit #184 – Hatfield Dep., 147:5-18.)

32.    On March 4, 2019, Mr. Muñoz was involved in a stabbing incident. This was his **26ᵗʰ documented encounter** with the LCBP.  (Trial Exhibit #26 – Defs.' Production, p. 105-106.)

      *a.*   A witness on scene, Maria Torres, recorded the incident on her phone and provided the LCBP officers with two videos. (Trial Exhibit #26 – Defs.' Production p. 183-185.) Her statement made clear that Mr. Muñoz was being attacked by at least three other people and that Mr. Muñoz was being "stomped on" by everyone. (Trial Exhibit #26 – Defs.' Production p.183-185.)

      b.   Another witness, Sara Delgado, told the LCBP officers that "a group of people [were] arguing with a single man…[T]he group had this single man surrounded and would not let him walk through…." Ms. Delgado said that "it was not fair that there were four people against one." (Trial Exhibit #26 – Defs.' Production, p.10-11.)

      c.   Ms. Peña recalls learning that Mr. Muñoz was going to work and four people attacked him. In response, he pulled out a knife to try to defend himself. (Trial Exhibit #180 – Peña Dep., 13:23-14:1.) Ms. Peña recalls being told that one of the videos showed that Mr. Muñoz did not start

the fight. (Trial Exhibit #180 – Peña Dep., 117:11-13.) Ms. Peña also learned that Mr. Muñoz was the victim and that the alleged victims "withdrew their accusations because they were lying." (Trial Exhibit #180 – Peña Dep., 119:22-120:1) According to his sister, Mr. Muñoz was attacked by four people. (Trial Exhibit #181 – R. Muñoz Dep., 113-:6-13; 116:19-22.) During the fight, Mr. Muñoz was placed in a chokehold and was injured. (Trial Exhibit #181 – R. Muñoz Dep., 118:2-3.)

d.  The LCBP officers tased Mr. Muñoz during this incident. (Trial Exhibit #181 – R. Muñoz Dep., 108:13-17.)

e.  Despite Mr. Muñoz's attempts to defend himself, as confirmed by witnesses and video, he was charged with aggravated assault. (Trial Exhibit #181 – R. Muñoz Dep., 116:25-117:4.)

f.  Mr. Muñoz spent a few months held in the Lancaster County Jail. (Trial Exhibit #180 – Peña Dep., 37:2-7.) After that, he was put on house arrest for a year, but Mr. Muñoz did not have the capacity to understand why or what he had done wrong. (Trial Exhibit #182 – **D**. Muñoz Dep., 68:3-9; Trial Exhibit #181 – **R**. Muñoz Dep., 122:17-19.)

g.  During the year he spent on house arrest, Mr. Muñoz became more paranoid.  He was constantly stuck in the house and would only step out to see his probation officer. (Trial Exhibit #181 – R. Muñoz Dep., 122:4-13.) He was left alone in his room with his thoughts. Rulennis

stated, "and since he's schizophrenic there was – I could just imagine how many crazy thoughts – weird thoughts and unsettling thoughts that he had in his head." (Trial Exhibit #181 – R. Muñoz Dep., 123:1-124:11.)

h. As the criminal case progressed, at some point the presiding judge ordered that restitution be paid to Mr. Muñoz because of the incident. (Trial Exhibit #180 – R Muñoz Dep., 117:5-8.; Trial Exhibit #199 – Transcript of Santos, p. 8/10.)

i. After his death, Mr. Muñoz received a restitution check from the perpetrators. (Trial Exhibit #62 – Restitution Check.)

j. Rulennis Muñoz testified that while Mr. Muñoz was in police custody for the March 2019 incident, he was never provided with a mental health assessment. (Trial Exhibit #181 – R. Muñoz Dep., 119:14-19.)

k. Chief Berkihiser—without any effort to verify the accuracy of his statements now or at the time that his department issued press releases in 2020— testified that Mr. Muñoz was the initial aggressor during this incident. (Trial Exhibit #187 – Berkihiser Dep., 134:16-22.) Despite witness statements within the LCBP's file on Mr. Muñoz, Berkihiser was not aware that Mr. Muñoz was the victim of the incident and that there was video demonstrating that Mr. Muñoz was being attacked and punched by four other people. (Trial Exhibit #187 – Berkihiser Dep., 134:23-135:14.)

14

## THE LCBP PROVIDED NO ACCOMMODATIONS OR SYSTEMS FOR REPEATED ENCOUNTERS WITH INDIVIDUALS WITH MENTAL HEALTH DISABILITIES BEFORE SEPTEMBER 2020.

33.    Ms. Peña testified that on at least five or six occasions LCBP officers had come to her home because Mr. Muñoz was becoming agitated, and he needed to be taken to the hospital. (Trial Exhibit #180 – Peña Dep., 44:6-13.)

34.    During one of Mr. Muñoz's mental health episodes, the responding LCBP officers told Ms. Peña that she should simply throw Mr. Muñoz out on the street.  Ms. Peña refused to do that to her son. (Trial Exhibit #180 - Peña Dep., 53:21-23; Trial Exhibit #181 – R. Muñoz Dep., 100-17-101:1.)

35.    Rulennis Muñoz confirmed that despite having information of Mr. Muñoz's past encounters, the LCBP never took any steps to make any accommodations for Mr. Muñoz's metal health disability. (Trial Exhibit #180 – R. Muñoz Dep., 119:114-120:1.)

36.    LCBP does not have any system in place to identify repeat interactions with people suffering from mental health disabilities. (Trial Exhibit #184 – Hatfield Dep., 147:20:148:11.)

37.    Chief Berkihiser and other supervisors were aware of the interactions Mr. Muñoz was having with the LCBP. "I am aware of some of those interactions; "we probably had some of that information." (Trial Exhibit #187 – Berkihiser Dep., 114:4-24.) Supervisors were also aware because each time the LCBP has an encounter with a citizen, an incident report is created. (Trial Exhibit #187 –

15

Berkihiser Dep., 127:3-8.) Each report is then reviewed and approved by a supervisors. (Trial Exhibit #187 – Berkihiser Dep., 127:9-13.)

38.    Despite the knowledge of the repeated encounters with Mr. Muñoz, no action was taken by any supervisor at the LCBP:

> Q: Okay. Do you know if at any time when the individual police officers, the patrol officers, and when these sergeants were receiving incident reports regarding Ricardo Muñoz, do you know if anyone sat down with the police officers and said, hey, this individual keeps having interactions with the police, let's talk about a plan for how we're going to respond the next time; do you know if that ever happened?
> A: No, it did not.

(Trial Exhibit #187 – Berkihiser Dep., 127:14-23.)

39.    Chief Berkihiser never established a team to explore implementing a system for assigning specific officers to mental health calls. (Trial Exhibit #187 – Berkihiser Dep., 128:15-129:1.)

40.    During the time that Berkihiser served as Chief, he never implemented an alert system to notify officers if an individual was having repeated interactions with the police department. (Trial Exhibit #187 – Berkihiser Dep., 131:15-20.)

41.    Berkihiser never coordinated with Lancaster County Communications to figure out a system that would allow the officers to receive a categorization level (telling them how serious the situation is) when responding to incidents. (Trial Exhibit #187 – Berkihiser Dep., 35:13-21.)

42.    Chief Berkihiser did not take any steps to inform the LCBP's partner, Lancaster County Communications, of the historical data for Mr. Muñoz. (Trial Exhibit #187 – Berkihiser Dep., 124:24-125:3.)

43.    LCBP did not hire a social worker until 2018 or 2019 to work at the department. (Trial Exhibit #187 – Berkihiser Dep., 40:4-9.)

44.    The records do not show a single instance during which the LCBP's social worker ever met with Mr. Muñoz, ever tried to coordinate a response for future encounters with Mr. Muñoz, or ever assisted the family during any of the 26th encounters Mr. Muñoz had with the police. (Trial Exhibit #26 – Defs.' Production, 105-125.)

45.    Officer Arnold had never participated in any type of planning process for any calls before September 13, 2020. (Trial Exhibit #189 – Arnold Dep., 187:9-14.)

## SEPTEMBER 13, 2020 THE SHOOTING & DEATH OF MR. MUÑOZ
### Rulennis Muñoz's calls to LCBP's Non-emergency line

46.    Earlier during the day on September 13, 2020, Mr. Muñoz was at his sister's house when he started to become agitated because he had lost his cellphone charger and started having distorted perceptions.  (Trial Exhibit #181 – R. Muñoz Dep., 48:7-49:8.) He was not able to think clearly or to reason with his family. Mr. Muñoz began to ramble, repeating the same thing over and over. (Trial Exhibit #181 – R. Muñoz Dep., 50:8-51:7.) Rulennis Muñoz described this a "mental health episode", during which Mr. Muñoz became "incoherent." (Trial Exhibit #181 – R. Muñoz Dep., 51:11-25.)

47.    On September 13, 2020, "Mr. Muñoz, like many patients suffering with major mental illnesses, was experiencing a period of psychiatric decompensation that manifested with erratic, paranoid behaviors that required emergent intervention to control." (Trial Exhibit #228 – Dr. Bazzi's Expert Report)

48.    Although Ms. Peña was worried about Mr. Muñoz given his history of self-harm, she did not feel threatened by him. (Trial Exhibit #180 – Peña Dep., 115:4-7.)

49.    Rulennis Muñoz called the LCBP non-emergency line approximately **_one hour_** before Officer Arnold shot and killed Mr. Muñoz. Sgt. Davis asked Rulennis Muñoz if there was any reason to arrest her brother and she said no, although she mentioned that Mr. Munoz was "causing problems for her mother." (Trial Exhibit #26 – Defs.' Production, p.235.)

50.     After receiving the call from Ms. Muñoz, there is no indication that Sgt. Davis ever provided any information about Mr. Muñoz to any of his colleagues within the department. (Trial Exhibit #26 – Defs.' Production, Incident Report Sgt. Davis at 235.) Sgt. Davis did not tell Officer Arnold any of this information. (Trial Exhibit #189 – Arnold Dep., 189:23-190:6.)

51.     After receiving the call from Rulennis Muñoz, Sgt. Davis did not place any alerts on Mr. Muñoz's home address. (Trial Exhibit #26 – Defs.' Production, p.235.)

## Debrah Muñoz's 911 Call

52.     At 4:13:21 p.m. Debrah Muñoz called 911. (Trial Exhibit #28 – County Production at 1.) This phone call lasted 2:12 minutes. (Trial Exhibit #1 – Initial 911 call, audio file.) During her lengthy conversation with the operator, Debrah's voice was calm throughout. (Trial Exhibit #1 – Initial 911 call, audio file.) She told the operator that her mother needed help with bringing her son to the hospital. (Trial Exhibit #1 – Initial 911 call, audio file.) She provided Mr. Muñoz's mental health history ("mental problems"; "bipolar schizophrenic"), address, and even spelled his last name. (Trial Exhibit #1 – Initial 911 call, audio file.) She told the operator that there were no weapons and that Mr. Muñoz had not been drinking nor was he doing any drugs. (Trial Exhibit #1 – Initial 911 call, audio file; (Trial Exhibit #182 – D. Muñoz Dep., 46:10-21.)

53.     At 4:15:39 p.m., the dispatcher transmitted the following information to the officers: "RPS brother is becoming aggressive w/ her mother has mental

issues//psychizophrenic/bi-polar punched inside of car trying to break into his mother's house no weapons no drinking/alcohol." (sic) (Trial Exhibit #26 – Defs.' Production at p.198.)

54.    In response, Officer Windlebeck radioed that he was stuck in traffic, about six blocks away: "So he alerted that he was shortly behind me. I think he said he was, like, six blocks away and stuck in traffic or something like that." (Trial Exhibit #189 – Arnold Dep., 47:17-19.)

55.    At <u>4:25:25 p.m</u>., Officer Arnold radioed that there have been shots fired (by him). (Trial Exhibit #26 – Defs.' Production p.98).

56.    When Officer Arnold received the call from dispatch, he knew the following: (1) there were no weapons involved; (2) there were no drugs or alcohol involved; (3) Mr. Muñoz had punched the inside of the car, but there was no violence against anyone; (4) Mr. Muñoz was having "some sort of episode." (Trial Exhibit #189 – Arnold Dep., 61:7-62:20; 71:3-24.)

57.    Officer Arnold acknowledged that at the time of the call, Mr. Muñoz had committed no crime. Punching the inside of a car is not a crime. Becoming aggressive due to a mental health episode is not a crime. (Trial Exhibit # 189 – Arnold Dep., 63:8-21)

58.    At the time that he received the call from the dispatcher, Arnold did not know anything about Mr. Munoz's prior encounters with the LCBP. (Trial Exhibit #189 – Arnold Dep., 65:21-24.) He did not have any information to suggest

Mr. Munoz had been aggressive in the past. (Trial Exhibit #189 – Arnold Dep., 66:1-10.)

59.     Officer Arnold testified that there are situations where domestic disturbance calls are also mental health calls. (Trial Exhibit #189 – Arnold Dep., 69:16-18.)

60.     When Officer Arnold received the call from dispatch, his safety was not an issue. As he was approaching the house, his safety was not an issue. As he was approaching the residence, the safety of other officers was not at issue. (Trial Exhibit #189 – Arnold Dep., 136:1-11.)

61.     When Officer Arnold received the call from dispatch, the safety of Ms. Peña was not at issue, either. (Trial Exhibit #189 – Arnold Dep., 136:12-16.)

62.     As far as Officer Arnold could tell, no one in the neighborhood was in danger when he got out of his vehicle. (Trial Exhibit #189 – Arnold Dep., 204:24-205:4.)

63.     When Officer Arnold received the call from dispatch, he had access to his vehicle computer and his WebCAD provided him with the name and phone number of the person who called 911 along with all the information dispatch had received from the caller. (Trial Exhibit #189 – Arnold Dep., 64:8-20.)

64.     Officer Arnold had time to check for active warrants while still in his cruiser. (Trial Exhibit #189 – Arnold Dep., 208:13-15.)

65.    When he received the call, Officer Arnold did not know if Mr. Muñoz lived at the address where he was dispatched, despite the 26 prior encounters. (Trial Exhibit #189 – Arnold Dep., 63:22-64:7.)

66.    Officer Windlebleck, a senior officer, did not ask Officer Arnold to wait for him before approaching. (Trial Exhibit #189 – Arnold Dep., 191:1-3.)

67.    It took Officer Arnold approximately 10 minutes to arrive at the house after he received the call from dispatch.  (Trial Exhibit #189 – Arnold Dep., 194:13-17.)

## Officer Arnold's Response

68.    Officer Arnold did not wait for backup and volunteered to approach the scene alone.

    a.    He never called for an ambulance before approaching.

    b.    He never requested additional information about Mr. Muñoz mental health history.

    c.    He never set up a perimeter around the house.

    d.    He did not wait for back up or "staged" to designate an officer to use less lethal force.

(Trial Exhibit #202 – Arnold BWC.)

69.    Despite having time to assess the situation, Officer Arnold had no plan for any contingencies:

Q: Other than wanting to look at the house and get some information, did you have any other plan for how this situation was going to be approached?
A: No. What I told you was pretty much my plan.

(Trial Exhibit #189 – Arnold Dep.,129:5-13.) (objection omitted)

> Q: Did you have a plan for any contingencies?
> A: No…

(Trial Exhibit #189 – Arnold Dep.,130:8-17.)(objection omitted)

> Q: Did you anticipate that because a person who may be suffering from mental health disorders that they may react violently when they see an officer approach; did you consider that?
> A: As I'm approaching the house, I was not considering that because, again, my intention was not to enter the house…

(Trial Exhibit #189 – Arnold Dep.,131:20-132:7.)

70.     Officer Arnold's only contingency plan as he approached Mr. Munoz's

house was to kill him, if he reacted violently:

> Q: If knowing that [Mr. Munoz] was [having] a mental episode, what was your backup plan when you approached the house for how you were going to respond if he acted violently toward you?
> A: He did act violently toward me, and that's what happened. I mean the incident speaks for itself. I don't know how you want me to answer this.

(Trial Exhibit #189 – Arnold Dep., 241:22-242:5.)

> Q: Did you think that maybe it would have been a good idea to wait for backup so that you wouldn't put yourself in a position where deadly force was your only option?
> A: Again, I can't speak for hindsight. What happened is what I thought was the best thing I could do at the time.

(Trial Exhibit #189 – Arnold Dep., 242:13-19.)

> Q: You had a choice as to whether to wait for backup or to approach on your own. You chose to approach on your own, correct?
> A.  I've already stated that. Yes.

(Trial Exhibit #189 – Arnold Dep., 244:19-22.)

71.     When Officer Arnold got the call from dispatch, he did not consider

that him approaching on his own, in his uniform, fully armed may escalate rather

than de-escalate the situation given Mr. Munoz's mental state. (Trial Exhibit #189 – Arnold Dep., 197:3-12.)

72.    Officer Arnold fired his gun and shot Mr. Muñoz at 4:25:05 p.m. (Trial Exhibit #202 – Arnold BWC at 0:50.)

73.    Officer Arnold requested EMS at 4:26:20 p.m. (Trial Exhibit #202 – Arnold BWC at 2:03.)

74.    Officer Arnold did not physically evaluate Mr. Muñoz for signs of life, such as checking his pulse.  (Trial Exhibit #189 – Arnold Dep., 215:5-7.)

75.    Officer Arnold did not try to stop Mr. Muñoz from bleeding out nor did he render aid to Mr. Muñoz. (Trial Exhibit #189 – Arnold Dep., 213:2-4)

76.    Officer Windlbleck cancelled the ambulance at 20:29:42 (4:29:42 p.m.). (Trial Exhibit #26 – Defs.' Production p.199.)

## **Events Immediately Following the Shooting**

77.    After Arnold shot her brother, Debrah Muñoz rushed out of her house. When she got to the scene, an officer pointed his gun at her and told her to stop. She was screaming and asking the officers to call the ambulance. Another person at the scene handed her a phone and Debrah called an ambulance herself. She kept asking "where's the ambulance?" But the ambulance never showed up. Then she overheard or was told that the ambulance was cancelled. (Trial Exhibit #182 – D. Muñoz Dep., 54:6-55:11.)

78.    After the shooting, Office Arnold was taken to the police station for questioning.

    a.  He rode in the front seat. (Trial Exhibit #202 – Arnold BWC at 5:21.)

    b.  He was able to call his wife and his parents. (Trial Exhibit #189 – Arnold Dep., 50:1-4.)

    c.  When he got to the police station, Officer Arnold was asked if he wanted to talk about the events then or later. (Trial Exhibit #189 – Arnold Dep., 201:11-17.)

    d.  Officer Arnold was provided with an "advocate" who was also employed as an officer by LCBP. (Trial Exhibit #189 – Arnold Dep., 199:14-20.)

    e.  Officer Arnold was calm and composed and able to speak in an articulate manner. (Trial Exhibit #189 – Arnold Dep., 200:2-10.)

    f.  Officer Arnold had access to his cellphone. (Trial Exhibit #189 – Arnold Dep., 200:22-24.)

    g.  Officer Arnold had his shoes on. (Trial Exhibit #189 – Arnold Dep., 200:1-4.)

    h.  After the interview was finished, LCBP officers assisted Officer Arnold with getting out of the police station and provided him with an escort. (Trial Exhibit #189 – Arnold Dep.,51:7-16.)

79.    After the shooting, Ms. Peña was also taken to the police station and detained for over five or six hours:

    a.  She was placed in the back of the police cruiser and locked inside;

    b.  She was not allowed to call her daughters or husband;

    c.  Ms. Peña was not allowed to have a lawyer advocate for her;

    d.  Ms. Peña was in a "delirious state", overcome with grief, and "in the process of not being able to stand."

    e.  Ms. Peña was not given access to a phone cellphone.

    f.  Ms. Peña did not have her shoes on.

    g.  Ms. Peña was never given the option to talk about the events at a later time.

    h.  Ms. Peña was detained for hours until a lawyer was able to find her and could have her released from the LCBP's custody.

(See PSOF Unlawful Detention)

## <u>NO EXIGENT CIRCUMSTANCES EXISTED THAT REQUIRED OFFICER ARNOLD TO RUSH HIS RESPONSE</u>

80.    "Call volume was pretty much dead, meaning there was hardly any call for service at that time…" (Trial Exhibit #183 – Ruiz Dep., 16:8-10.)

81.    When dispatch first made contact with Arnold about the 911 call, Officer Arnold was parked and was completing some reports on his computer in his vehicle. (Trial Exhibit #189 – Arnold Dep., 46:22-47:1.)

82.    Officer Windlebleck was assigned to Section 6, which is where the Muñoz home was located. Officer Windlebleck came on the radio and notified Officer Arnold that he was shortly behind him. He was "stuck in traffic" approximately six block away. (Trial Exhibit #189 – Arnold Dep., 47:13-19.)

83.    Officer Windlebleck did not activate his sirens or lights until 4:25:13—*after* Officer Arnold had radioed that he had shot Mr. Munoz. (Trial Exhibit #112 – Windlebleck BWC at 00:32.)

84.    During the 10 minutes between the initial call and his arrival at the Muñoz's residence, the dispatcher never provided Officer Arnold any additional information suggesting that the circumstances had escalated to include violence. (Trial Exhibit #189 – Arnold Dep., 74:6-10; 195:2-8.)

85.    Intervening was not something on Arnold's mind because there was no one, for example, punching each other. (Trial Exhibit #189 – Arnold Dep., 58:18-59:22.)

86.     Officer Arnold decided to approach the residence simply "to gather whatever information he could prior to [Windlebleck's] arrival." (Trial Exhibit #189 – Arnold Dep., 47:20-24.)

87.     Officer Arnold testified that "And my intention, of course, was not to run up to the residence and burst inside the house. That's not what I was intended to do whatsoever. I was just walking up and trying to get whatever information I could until [Windlebleck] arrives because I knew he would be shortly behind me." (Trial Exhibit #189 – Arnold Dep., 57:18-23)

88.     Berkihiser testified that a dispatch to a domestic incident does not call for a large police response compared to other calls when there is an active crime. (Trial Exhibit #187 – Berkihiser 135:22-136:3.)

89.     Mr. Dan Linskey, Plaintiff's retained expert, has opined that "Muñoz had committed no crime and had caused no harm to anyone. Muñoz was not under the influence of drugs and was not an imminent threat to anyone. Therefore, when Officer Windlbleck was assigned as the primary responding officer and Officer Arnold was assigned as the secondary responding officer, they had plenty of time to coordinate a response that sought to avoid lethal force. (Trial Exhibit #222 – Mr. Linskey Expert Report, p.24.)

90.     Mr. Linskey further states: "Officer Windlbleck and Arnold should have discussed how to best respond to this situation. Officer Windlbleck should have ordered Arnold to wait for his arrival so that at the very least one of them could have been designated as the person to use less-lethal force. Officer Arnold

should have "staged" his approach and waited for backup before approaching the house. Had any of these techniques been used, it is likely, if not certain, that proper de-escalation techniques would have been utilized and Muñoz would have been safely transported to the hospital for a psychological evaluation." (Trial Exhibit #222 – Mr. Linskey Expert Report, p.24.)

## **FAILURE TO PROVIDE MEDICAL CARE AFTER THE SHOOTING**

91.     Following the shooting, which occurred at **4:25:25** p.m., additional

police officers, including Officer Windlebleck, Officer Mazzante, Officer Dickinson,

Officer Witmer, and Officer Ruiz, arrived at the scene:

   a.  Officer Windlebleck arrived at 4:26 p.m. (Trial Exhibit #26 – Defs.'
       Production, p. 268-269.)

   b.  Officer Ruiz arrived at 4:26 p.m. (Trial Exhibit #26 – Defs.' Production,
       p. 268-269.)

   c.  Officer Dickinson arrived at 4:27 p.m. (Trial Exhibit #26 – Defs.'
       Production, p. 268-269.)

   d.  Officer Mazzante arrived at 4:32 p.m. (Trial Exhibit #26 – Defs.'
       Production, p. 268-269.)

   e.  Officer Witmer arrived at 4:32 p.m. (Trial Exhibit #26 – Defs.'
       Production, p. 268-269.)

92.     At **4:29:42**, the officers canceled the ambulance that was already *en
route*: "EMS can CNXL". (Trial Exhibit #26 –Defs. Production at 265)

93.     Between 4:25:25 and 4:29:42, the officers took no action despite that

her neighbors pleaded with them to call an ambulance and attempt to save Mr.

Muñoz's life. (Trial Exhibit #112 – Windlebleck BWC).

   a.  Officer Windlebleck never provided any medical assistance to Mr.
       Muñoz (Trial Exhibit #185 – Windlebleck Dep., 42:23-43:1).

b.  Officer Windlebleck never touched Ricardo to determine if he was alive (Trial Exhibit #185 – Windlecleck Dep., 41:17-22).

c.  Officer Windlebleck testified that officers Witmer and Dickinson checked for pulse and breathing, "within minutes of their arrival" but did not know how long Mr. Muñoz had been on the floor by the time they arrived" (Trial Exhibit #185 – Windlebleck Dep., at 41:23-42:16). However, the BWC does not support this statement. (Trial Exhibit #112 – Windlebleck BWC.)

d.  Officer Witmer did not provide any type of emergency medical assistance to Mr. Muñoz (Trial Exhibit #185 – Windlebleck Dep., 42:20-22).

e.  Officer Dickinson did not provided any type of emergency medical assistance to Mr. Muñoz (Trial Exhibit #185 – Windlebleck Dep. at 42).

f.  Officer Arnold provided no medical assistance to Mr. Muñoz. (PSOF ¶¶ 77, 78.)

g.  Officer Arnold remembers "standing there because he lifted his head a few times." (Trial Exhibit #189 – Arnold Dep., 49:1-5.) "Officer Arnold explained Muñoz lifted his head a couple of times before then becoming unresponsive." (Trial Exhibit #26 – Defs.' Production p.273.)

h.  Officer Ruiz "did not render any type of aid [to Ricardo] at that time." (Trial Exhibit #183 – Ruiz Dep., 19:14-17.)

i. When he got to the scene, Officer Ruiz did not see any police officer providing CPR to Mr. Muñoz and he personal never provided any CPR. (Trial Exhibit #183 – Ruiz Dep., 20:12-18.)

j. Officer Ruiz made an "assumption" that Mr. Muñoz was dead because he was facedown when he arrived at the scene yet he never verified his pulse. (Trial Exhibit #183 – Ruiz Dep., 20:23-21:13.)

k. Officer Mazzante never provided any type of medical assistance to Mr. Muñoz. (Trial Exhibit #186 – Mazzante Dep., 53:3-6.) She never observed any officer attempting to stop Mr. Muñoz from bleeding out. (Trial Exhibit #186 – Mazzante Dep., 58:19-59:1.)

l. Officer Mazzante never observed any of her colleagues checking on Mr. Muñoz's in any way. (Trial Exhibit #186 – Mazzante Dep., 53:7-11.) The closest she ever got to the body was three to five feet. (Trial Exhibit #186 – Mazzante Dep., 53:12-17.) She never approached Mr. Muñoz to confirm whether he was still breathing after the shooting. (Trial Exhibit #186 – Mazzante Dep., 59:12-18.)

94. The BWC videos confirm that no police officer ever checked Mr. Muñoz's' vital signs. (*See* generally, Trial Exhibits #112, #202, #203.)

95. Officer Arnold never observed any of his colleagues assessing Mr. Munoz for vital signs within the first few minutes after the shooting. (Trial Exhibit #189 – Arnold Dep., 224:14-22)

96.    When Debrah Muñoz got to the scene, she observed Mr. Muñoz's hand moving. (Trial Exhibit #182 – D. Muñoz Dep., 72:2-7.)

97.    Debrah Muñoz described the minutes after the shooting like this: "All she could think [after the shooting] was 'who's going to help my brother? Nobody has even, you know, gone near him to check for anything. Like, what is going on? So I am just frantically waiting for the ambulance. And then to find out that the ambulance got canceled, that's when I just screamed even louder 'I need help. I needed somebody, just somebody, to go and check his pulse, you know, and that didn't happen.'" (Trial Exhibit #182 – D. Muñoz Dep., 73:1-15.)

98.    Ms. Peña testified that after the shooting, "it wasn't known [] if he was dead or not because no one checked him out." (Trial Exhibit #180 – Peña Dep., 109:11-15.) "When the police officer shot my son, no one went up to him…they didn't check to see if he needed an ambulance. They didn't call an ambulance." (Trial Exhibit #180 – Peña Dep., 110:13-16.)

99.    When Rulennis Muñoz arrived at the scene, she did not see an ambulance nor did she see any police officers trying to check Mr. Muñoz's pulse or doing any type of CPR. (Trial Exhibit #181 – R. Muñoz Dep., 95:25-5.)

100.    At no point did Rulennis Muñoz hear any of the officers ask the crowd if anyone had any type of medical training or if there were any nurses or doctors among them. (Trial Exhibit #181 – R. Muñoz Dep., 95:10-14.)

101.    Once at the scene, Rulennis Muñoz recalls asking if they had given Mr. Muñoz CPR and she was screaming out "Where's the ambulance?" (Trial Exhibit #181 – R. Muñoz Dep., 69:18-23.)

102.    Approximately **7 minutes after the shooting (at 4:32 p.m.),** a firefighter was permitted to enter the crime scene. Captain Nonnemacher was the first and only person who checked Mr. Muñoz's vital signs. By that time, Mr. Muñoz was already dead. (Trial Exhibit #112 – Windlebleck BWC 20:32Z.)

103.    The coroner declared Mr. Muñoz dead at 6:35 p.m. (Trial Exhibit #26 – Defs.' Production, p.253.)

104.    The coroner documented the presence of "pulmonary edema" and "congestion" in Mr. Muñoz's lungs. (Trial Exhibit #26 – Defs.' Production, p.260.)

105.    Plaintiff has disclosed the opinions of Dr. Benjamin Friedman, an Emergency Medicine physician who frequently treats patients with gunshot wounds. Dr. Friedman is familiar with the trauma guidelines related to how to treat patients with gunshot wounds. He is familiar with the timeline of how gunshot wounds affect the human body and the timeframes for providing critical medical intervention following a gunshot wound. He has personally treated dozens of patients with gunshot wounds. (Trial Exhibit #226 – Dr. Friedman Expert Report, p.1.)

106.    Based on his review of the evidence, Dr. Friedman has given the following relevant opinions:

  a. Mr. Muñoz was alive for several minutes after the shooting.

b.  The presence of pulmonary edema implies that [Mr. Muñoz's] heart and lungs continued to function, albeit sub-optimally, after the devastating injuries.

c.  Finally, the injuries sustained by Mr. Muñoz indicate that he died from hemorrhagic or obstructive shock. Both of these are progressive and reversible processes.

d.  The fact that Mr. Muñoz did not die instantaneously means that a well-functioning trauma healthcare system could have saved him.

(Trial Exhibit #226 – Dr. Friedman Expert Report, p.2-4.)

107.   Dr. Friedman has concluded that if the police officers at the scene had provided emergency medical care and not cancelled the ambulance, there is a chance Mr. Muñoz could have survived. (Trial Exhibit #226 – Dr. Friedman Expert Report, p2-4.)

108.   Dr. Friendman also concluded that "Officer Windlebleck's testimony and report in which he claims to have known that Mr. Muñoz was beyond help by visually observing him is not consistent with medical principles. It would have been impossible for an officer with no medical training to make that determination without a physical examination. The only way to verify for signs of life is by physically examining the patient." (Trial Exhibit #226 – Dr. Friedman Expert Report at 4.)

109.    Defendants' expert witness on this issue is Dr. Clifford Nelson, a forensic pathologist. (Trial Exhibit #219 – Nelson Dep., 6:11-12.) Dr. Nelson does not treat patients and never has. (Trial Exhibit #219 – Nelson Dep., 9:23-10:5.)

110.    Dr. Nelson is not familiar with the trauma guidelines for how to treat patients with gunshot wounds. (Trial Exhibit #219 – Nelson Dep., 22:1-4.) Dr. Nelson has never during his medical career provided CPR, first aid, or checked someone's pulse. (Trial Exhibit #219 – Nelson Dep., 21:10-19.) He has never diagnosed any patient for purposes of proving medical care, recommendations, or treatment. (Trial Exhibit #219 – Nelson Dep., 22:14-18.)

111.    He offered the opinion that Mr. Munoz died within less than one to two minutes after he was shot, but admitted that the wounds Mr. Munoz had can be treated at a Level 1 trauma center to save people's lives. (Trial Exhibit #219 – Nelson Dep., 30:13-31:16.)

## **INADEQUATE TRAINING**

112.    Officer Arnold believed based on his training that it was okay for him to respond alone. (Trial Exhibit #189 – Arnold Dep., 57:13-18.)

113.    Officer Arnold would have responded exactly the same to this situation regardless of whether it was categorized as a mental health call or a domestic disturbance call. (Trial Exhibit #189 – Arnold Dep., 75:12-21.)

**Officer Arnold's Training at the Police Academy**

114.    Before responding to this incident, the majority of Officer Arnold's training regarding how to respond to individuals experiencing a mental health crisis came from the training academy. (Trial Exhibit #189 – Arnold Dep., 75:23-76:8.)

115.    Officer Arnold received his cadet training and training booklet in 2017 through MPOETC. (Trial Exhibit #189 – Arnold Dep., 78:23-79:1.)

116.    The training materials by MPOETC provide "theoretical" concepts about individuals with special needs. (Trial Exhibit #189 – Arnold Dep., 100:10-14.)

117.    The materials in the booklet merely provide "an overview of everything, not broad." (Trial Exhibit #189 – Arnold Dep., 100:10-23.)

118.    Officer Arnold's training booklet contains long outdated information. In the section specific to mental health issues, the booklet used the term "mental retardation." (Trial Exhibit #148 – Training Booklet., p. 103.)

    a.  This is a derogatory term no longer accepted in society.

    b.  The term mental retardation appears in the booklet over 23 times.

    c. One of the websites listed as reference in Officer Arnold's booklet updated its stance on the use of the term "mental retardation" and explained that "Statements such as these, particularly when used by someone at a high level, amplify pervasive societal attitudes that people with intellectual and developmental disabilities somehow don't measure up or that their lives are worth less….For people with disabilities, it is disrespectful and demeaning and only serves to marginalize a constituency that already struggles for empowerment on every front."

(Trial Exhibit #189 – Arnold Dep., 116:10-118:4; 119:7-15 www.thearc.org )

    119. Although MPOETC provides some basic training, it does not supervise or evaluate Officer Arnold's day-to-day performance. (Trial Exhibit #189 – Arnold Dep., 94:6-95:3)

    a. MPOETC does not exercise control over the day-to-day practices of the LCBP. (Trial Exhibit #189 – Arnold Dep., 95:4-10; 96:16-21.)

    b. Likewise, MPOETC does not provide any written policies to the LCBP (Trial Exhibit #189 – Arnold Dep., 95:14-21.)

    c. The institution that directs Officer Arnold's day-to-day job responsibilities is the LCBP. (Trial Exhibit #189 – Arnold Dep., 101:5-10.)

**Officer Arnold's Training at the LCBP**

120.    From the time he graduated from the police academy and Mr. Munoz's death, Officer Arnold testified that he participated in some talks about mental health issues, which he described as "pretty broad." **"But formal training from the police department itself, no."** (Trial Exhibit #189 – Arnold Dep., 77:12-78:3.)

121.    Officer Arnold only attended one or two first aid classes related to mental health after graduating from the police academy—both of which took place *after September 13, 2020.* (Trial Exhibit #189 – Arnold Dep., 77:3-11.)

122.    Although officer Arnold says he is "sure" he has had more training on these issues, he was not able to provide additional details. (Trial Exhibit #189 – Arnold Dep., 76:22-77:2.)

123.    Officer Arnold testified that the trainings he received at LCBP after he left the police academy were not specific to individuals suffering from mental health disturbances or the Americans with Disabilities Act. Some of his trainings contained a general overview of these concepts. (Trial Exhibit #189 – Arnold Dep., 171:23-172:18; Trial Exhibit #26 – Defs.' Production p.313-315.)

a.    For example, the 45-minute training for welfare checks provided an overview, but he did not know how many minutes were devoted to mentally disabled individuals. (Trial Exhibit #189 – Arnold Dep., 174:18-175:8.)

b.    Of the 16-hour course on "Firearms/Use of Force" training in 2019, he estimates that he received "maybe an hour" training discussing how to

respond to individuals suffering from mental health disturbances.

(Trial Exhibit #189 – Arnold Dep., 175:19-24; Trial Exhibit #26 – Defs.'

Production p.313-315.)

124.    At the LCBP, firearms training is mandatory twice a year. (Trial

Exhibit #189 – Arnold Dep., 107:10-12; Trial Exhibit #187 – Berkihiser 49:17-50:5.)

In contrast, crisis intervention training is voluntary and consists of a single 8-hour

course. (Trial Exhibit #189 – Arnold Dep., 107:4-7.)

125.    Officer Arnold has never received crisis intervention training. (Trial

Exhibit #189 – Arnold Dep., 85:3-5)

126.    As to dealing with individuals suffering with mental health

disabilities, Officer Arnold stated:

> Q: Did the Lancaster Bureau of Police give you specific direction as to what
> reasonable accommodations meant?
> A: Not that I can think of.

(Trial Exhibit #189 – Arnold Dep., 102:4-7.)

127.    Officer Arnold believes that the only specialized training requirement

to competently respond to a Person in Crisis is to be a good human toward them:

> Q. During the surviving verbal conflict, did you receive any training on The
> Americans with Disabilities Act or the Rehabilitation Act of 1973?
> A. Again, I -- I don't recall any specifics. **A lot of this stuff is kind of one
> and the same.** It's how to talk with people and people with mental
> disabilities and -- and whatever sort of disabilities they have. **It's just being
> a good human** being to them, it's really what it comes down to, and
> communicating well and trying to help them. It's -- **I think it's pretty
> common sense**.

(Trial Exhibit #189 – Arnold Dep., 176:7-17.)

128.    When asked if he had received specific guidance as to how to modify his response to an individual suffering from a mental health disability versus someone else in the community, he reiterated that the approach "just goes back to being a good human being." (Trial Exhibit #189 – Arnold Dep., 178:2-179:19.)

129.    Officer Arnold has never been trained to use any intermediate munition, such as a shotgun with a bean bag or a launcher. (Trial Exhibit #189 – Arnold Dep., 146:11-16.)

130.    He is only personally aware of one officer within the LCBP who has been trained to use less lethal munition. (Trial Exhibit #189 – Arnold Dep., 146:17-24.)

131.    Officer Arnold, based on his training and departmental practices, believed his response to the incident was appropriate. (Trial Exhibit #189 – Arnold Dep., 124:4-11.)

132.    The "After Action Review" involving the shooting of Mr. Muñoz did not involve anything beyond the few seconds when Mr. Muñoz is seen exiting the house and Officer Arnold shoots him. (Trial Exhibit #184 – Hatfield Dep., 36:9-19.)

133.    Although Officer Hatfield could remember how "good" officer Arnold had handled the situation, he could not remember a single thing that was discussed about room for improvement or what went bad during LCBP's response to this incident. (Trial Exhibit #184 – Hatfield Dep., 37:14-38:21; 152:13-22.)

134.    Despite being the person who fired his gun at Mr. Muñoz, Officer Arnold was not present at the "After Action Review" of this incident. (Trial Exhibit #184 – Hatfield Dep., 37:6-7.)

135.    Officer Arnold was awarded a "commendation for valor" for using deadly force to kill Mr. Muñoz on September 13, 2020. The commendation acknowledges that Officer Arnold "arrived alone" and that Mr. Munoz was an individual "who suffered from mental health issues." (Trial Exhibit #26 – Defs.' Production p.302.)

136.    The supporting documents accompanying the nomination do not mention Mr. Munoz's long history of encounters with the LCBP, the fact that no plan was ever created for future encounters, that Officer Arnold's only backup plan in dealing with a person in crisis was to use deadly force, or that Officer Arnold did not provide any type of first aid after he shot Mr. Munoz. (Trial Exhibit #26 – Defs.' Production p. 303-305.)

## LCBP's Failure to Implement a Law-Enforcement-Based Crisis Intervention Team.

137.    There is no "crisis intervention team" within the LCBP. (Trial Exhibit #189 – Arnold Dep., 84:22:85:2.)

138.    The City of Lancaster also does not have a crisis intervention team. (A (Trial Exhibit #189 – Arnold Dep., 86:4-6)

139.    In September 2020, LCBP did not have a designated patrol unit responsible for responding to incidents involving mental health crises. (Trial Exhibit #189 – Arnold Dep., 108:3-7.)

140.    Despite knowing that approximately 50% of the calls received by LCBP involve mental health issues (Trial Exhibit #187 – Berkihiser Dep 133:7-134:3), between 2010 and 2020, crisis intervention training was not mandatory for LCBP officers. (Trial Exhibit #187 – Berkihiser Dep., 42:19-23.)

141.    LCBP offered voluntary crisis intervention training (an 8-hour course) for LCBP officers, but Chief Berkihiser did not know how many officers had received this basic training course. (Trial Exhibit #187 – Berkihiser Dep., 43:2-5; 43:21-24.)

142.    Crisis intervention training is different than Crisis Intervention Team. LCBP did not have a Crisis Intervention Team at anytime between 2010 and October 2020. (Trial Exhibit #187 – Berkihiser Dep., 44:1-6.)

143.    Chief Berkihiser does not know how the 8-hour course of "crisis intervention training" differs from the training that a Crisis Intervention Team within police departments receive. (Trial Exhibit #187 – Berkihiser Dep., 44:7-12.)

144.    During his tenure and decades of experience, Chief Berkihiser never signed up to receive the 8-hour crisis intervention training certification. (Trial Exhibit #187 – Berkihiser Dep., 52:20-22.)

145.    Chief Berkihiser does not know for how long Crisis Intervention Teams have been used around the country by other police departments. (Trial Exhibit #187 – Berkihiser Dep., 98:13-20.)

146.    During his tenure as Chief, Berkihiser was responsible for advocating for resources (budged, staffing) for the LCBP. (Trial Exhibit #187 – Berkihiser Dep.,

94:24-96:7.) Yet, he never applied for any grants to allow him to implement any type of Crisis Intervention Team within the department. (Trial Exhibit #187 – Berkihiser Dep., 98:22-99:3.)

147. Despite knowing that approximately 50% of the calls received by LCBP officers involve mental health issues, Chief Berkihiser never designated a team of officers to be responsible for responding to mental health calls. (Trial Exhibit #187 – Berkihiser Dep., 48:1-6.)

148. Chief Berkihiser also never had any conversation with other policy makers or community organizations to provide input as to how mental health individuals should be diverted from the criminal justice system. (Trial Exhibit #187 – Berkihiser Dep., 46:17-47:24.)

149. During Berkihiser's tenure, there were no specific programs at the LCBP to try to divert individuals suffering from mental health disabilities away from the criminal justice system. (Trial Exhibit #187 – Berkihiser Dep., 44:15-21.)

150. During the time at LCBP, the County had a "crisis intervention" program with 2 caseworkers. (Trial Exhibit #187 – Berkihiser Dep., 53:21-24.) This was an operation outside of the police department. It was up to the individual officer's discretion whether to call the County service based on the information they were given and the training they had. (Trial Exhibit #187 – Berkihiser Dep., 55:11-15.)

151. Before Mr. Muñoz's shooting there was no standardized response (such a co-responder model with law-enforcement-based Crisis Intervention for how to

respond to individuals suffering from mental health disabilities. The response was "more based on the officer's perception of what the type of call was because [the LCBP] only had one social worker [] and she wasn't available all the time." (Trial Exhibit #187 – Berkihiser Dep., 109:14-110:7.)

152.    Officer Mazzante testified that, during her 16 years as a police officer for the LCBP, there has been no specific training to evaluate whether LCBP appropriately responds to incidents involving individuals with mental health disabilities. (Trial Exhibit #186 – Mazzante Dep., 75:23-76:15.)

153.    Despite the filing of this lawsuit, no supervisor has ever discussed with Officer Mazzante whether LCBP's response to Mr. Muñoz's shooting was appropriate. (Trial Exhibit #186 – Mazzante Dep., 75:8-20.)

154.    Although the LCBP officers, including Chief Berkihiser, claim to have recurrent and thorough training on all issues involved in this case, they could not provide any specifics about such training:

   a.    Berkihiser—during his 30(b)(6) Deposition—could not provide the names of any of the individuals who were designated as the training officer from 2010 through 2020. (Trial Exhibit #187 – Berkihiser Dep., 63:10-24.)

   b.    Berkihiser—during his 30(b)(6) Deposition—could not provide the names of any training vendors who provided training to LCBP officers. (Trial Exhibit #187 – Berkihiser Dep., 64:7-65:4.)

c.  Berkihiser—during his 30(b)(6) Deposition—could not provide the title of any specific training LCBP officers had received regarding the ADA. (Trial Exhibit #187 – Berkihiser Dep., 150:16-151:3.)

d.  Berkihiser—during his 30(b)(6) Deposition—did not *bring or produce* any materials that were presented to the LCBP officers that involved mental health or the ADA. (Trial Exhibit #187 – Berkihiser Dep., 151:4-8.)

e.  Berkihiser—during his 30(b)(6) Deposition—did not *review* any training materials that were presented to the LCBP officers that involved mental health or the ADA. (Trial Exhibit #187 – Berkihiser Dep., 151:9-12.)

f.  Berkihiser—during his 30(b)(6) Deposition—did not know how many officers had received any type of training involving the ADA and mental health disabilities. (Trial Exhibit #187 – Berkihiser Dep., 151:13-23.)

g.  Berkihiser—during his 30(b)(6) Deposition—did not know any information about the nature of the PowerPoint presentations that were allegedly given to the LCBP officers on these issues. (Trial Exhibit #187 – Berkihiser  Dep., 151:24-152:4.)

155.  Mr. Linkskey summarized it this way: "The testimony in this case makes clear that no [law-enforcement-based] CIT unit existed to respond to calls involving mentally ill citizens. Although at times officers were encouraged to

collaborate with a CIT unit outside of the department, that CIT group was not part of the police force and was not readily available to respond 24/7." (Trial Exhibit #222 – Dan Linskey Expert Report p.24/55.)

156.    Mr. Linskey also explained that [law-enforcement-based] CIT training originated in the late 1980s and has since spread to literally all states in the nation." If officers are responding to calls involving mental health crises, then a CIT unit with a "specialized skill set" is necessary for officers to safely and successfully resolve calls involving such persons. (Trial Exhibit #222 – Dan Linskey Expert Report p.24-25.)

## **Lack of Training Involving Medical Emergencies**

157.    Officer Mazzante testified that although LCBP officers receive some training on how to "stop bleeding and to treat until EMS can get there" (Dep., 56:19-22) officers are not provided with EMS training. (Trial Exhibit #186 – Mazzante Dep., 58:15-18.)

158.    She testified:

Q. And then at what point or what are the things that EMS is able to do that you guys are not able to do?
[Objections omitted]
A: I don't go through that training, so I'm assuming it's a lot more, but I don't know.
Q. When EMS in your experience, when EMS typically arrives to the scene, do they have different equipment than what's in your trauma bag?
A. Yes.
Q. In terms of actual procedures that they perform when EMS is responding to a gunshot wound, is there something different than you have observed that you are not familiar with?
A: Yes.
Q. Can you describe in your own observations what are the types of things that they're able to do that you wouldn't be able to do?

47

A. I feel as if they're trained and they have more equipment. I mean that in itself says how much more they can do. I don't know specifically though.
Q. And fair to say that police officers at the Lancaster Bureau are not provided with that EMS training?
A. Correct, not the same training.

(Trial Exhibit #186 – Mazzante Dep., 57:2-58:18) (objections omitted).

159.    Additionally, none of her supervisors addressed whether canceling the ambulance in Mr. Muñoz's case was an appropriate decision. (Trial Exhibit #186 – Mazzante Dep., 81:18-21.)

160.    Officer Windlebleck testified that although he received training about gunshot wounds prevention during his time in the army, he has not received any other training in over 20 years. (Trial Exhibit #185 – Windlebleck Dep., 26:13-15; 27:2-4.)

161.    During first aid training, Officer Windlebleck was not taught that immediate medical attention, meaning within 30 seconds to a minute, must be provided to a person suffering from a gunshot wound. (Trial Exhibit #185 – Windlebleck Dep.,33:17-23.)

162.    LCBP did not provide the responding officers with an department trauma bag; rather, Officer Windlebleck constructed his own "trauma bag" based on what he believed was appropriate for catastrophic injuries. (Trial Exhibit #185 – Windlebleck Dep.,43:2-44:14.)

## INADEQUATE SUPERVISION

163.    Officer Arnold graduated from the police academy in November 2017. (Trial Exhibit #189 – Arnold Dep., 20:17:19) The first time he participated in active patrol duty was the first week of January 2018. (Trial Exhibit #189 – Arnold Dep., 21:9-13.)

164.    Officer Arnold only received three (3) months of close supervision where another officer would ride with him. The first month consisted of him observing a senior officer. The second month involved a bit more interaction with the various callers. The third month, he would lead the interactions. (Trial Exhibit #189 – Arnold Dep., 21:20-22:11; 24:14-21; 25:22-24.)

165.    After just three months, Officer Arnold was allowed to start driving his cruiser without a second officer present. (Trial Exhibit #189 – Arnold Dep., 26:4-7.)

166.    In September of 2019, Officer Arnold's employee review revealed that he was "still very young and inexperienced."

      a.    His supervisors noted that Officer Arnold "lacks experience and knowledge that will come with more time on the street."

      b.    As his strongest points, his supervisors wrote: "For a younger, inexperienced officer, Officer Arnold writes very thorough and detailed reports."

      c.    Under areas for improvement, his supervisors wrote: "He lacks experience and knowledge that will come with more time on the street."

d. Under plan for improvement, three sergeants, one lieutenant, and the captain stated: "Officer Arnold is encouraged to seek out training, both in house and out, to gain further knowledge and skill. He is also encouraged to **seek out to ride with more seasoned officers** to open him up to new experiences." (Trial Exhibit #26 – Defs.' Production p.300.)

167.   Arnold's supervisors did not give him any specific guidance as to what he should be doing to gain more experience. (Trial Exhibit #189 – Arnold Dep., 157:19-158:10.)

168.   Despite his lack of experience, after this 2019 review, the sergeants, the lieutenants, and the captain allowed Arnold to continue to patrol on his own. (Trial Exhibit #189 – Arnold Dep., 160:6-12.)

169.   Despite his lack of experience, Arnold's supervisor allowed him to respond by himself and did not require him to patrol with a partner. (Trial Exhibit #189 – Arnold Dep., 161:14-17.)

170.   In early 2020, Officer Arnold's performance review indicated: "is careless and inconsistent in the care and operation of equipment. **Requires close supervision."** The equipment included "patrol vehicle, lockers, and other equipment. (Trial Exhibit #26 – Defs.' Production p.294.)

171.   Officer Arnold does not recall receiving any specific supervision regarding, as suggested in the evaluation form. (Trial Exhibit #189 – Arnold Dep., 168:3-13; 169:1-9.)

172.    In 2020, the senior officers were assigned a certain section of the city, but Officer Arnold, as a junior officer, was a floater without an assigned sector. (Trial Exhibit #189 – Arnold Dep., 27:13-23.)

173.    On September 13, 2020, Officer Arnold was designated as the "secondary" responding officer; Officer Windlebleck was the primary officer. (Trial Exhibit #185 – Windlebleck Dep., 176:8-11.)

174.    Despite being the primary officer, Windlebleck did not discuss with Officer Arnold that he should wait for him to arrive at the scene since he was shortly behind him. (Trial Exhibit #189 – Arnold Dep., 57:8-12.)

175.    When asked if he sought clearance from any of his supervisors to approach the Munoz house alone rather than wait for Officer Windlebleck, Officer Arnold testified: "No. So I mean that's not typical practice we do." (Trial Exhibit #189 – Arnold Dep., 27:13-23.)

176.    Officer Arnold's supervisors, before September 13, 2020, never informed him of Mr. Munoz's past encounters with the LCBP nor did they inform him that Mr. Munoz was suffering from a disability. (Trial Exhibit #189 – Arnold Dep., 105:15-106:1.)

177.    Before September 13, 2020, Officer Arnold's supervisors never required him to develop a plan in advance for responding to incidents involving individuals with a history of mental health issues and repeated interactions with LCBP. (Trial Exhibit #189 – Arnold Dep., 185:17-24.)

178.    Supervisors at LCBP did not have a system set up where information about an individual's mental health history or past encounters with the LCBP would be communicated to patrol officers. (Trial Exhibit #189 – Arnold Dep., 106:3-12.)

179.    By September 2020, although Arnold had been in the police force for two years, was given the discretion to decide to approach on his own or wait for backup. Arnold Dep., 167:2-7. His supervisors did not expect him to consult with any team member before responding: "I had my discretion to act as I deemed to be best for whatever call I'm responding to." (Trial Exhibit #189 – Arnold Dep., 187:15-188:1.)

180.    Specifically for this case, Officer Arnold's supervisors did not except him to discuss with any other officer or to come up with a plan before approaching. (Trial Exhibit #189 – Arnold Dep., 188:2-9.)

## INADEQUATE POLICIES & PROCEDURES

181.    Defendant Berkihiser is the individual with the most knowledge about the policies and procedures at the LCBP, including those specifically related to mental health disabilities in effect in September 2020. (Trial Exhibit #187 – Berkihiser Dep., 24:14-17.)

182.    Berkihiser is a final policymaker. Berkihiser's signature is included in the policies and procedures because he was "the final reviewer of those policies." (Trial Exhibit #187 – Berkihiser Dep., 60:20-61:3.) He testified:

> Q: And the policies don't have the signature of any other individual who might have reviewed them. It's usually the police chief who's making the final determination, correct?
> A: Correct.

(Trial Exhibit #187 – Berkihiser Dep., 61:18-22.)

183.    The policies were reviewed by other individuals, including legal counsel, but they ultimately "came to [him] to issue or implement that policy." (Trial Exhibit #187 – Berkihiser Dep., 61:8-15.) Berkihiser testified that "the way [he] see[s] it, it began and stopped with [him]…Essentially, [he] started it and [he is] the one who pushed the policy out once it was completed. (Trial Exhibit #187 – Berkihiser Dep., 62:14-63:9.)

184.    Officer Arnold also confirmed this role: "the policies in and of itself is (sic) created by the chiefs and the administrative staff, commanding staff." (Trial Exhibit #189 – Arnold Dep., 95:19-21)

185.    During Berkihiser's tenure as Chief of the LCBP, there was no specific written policy or procedure addressing what the ADA requires or outlining

53

measures police officers should take to comply with the ADA when responding to mental health calls. (Trial Exhibit #187 – Berkihiser Dep., 136:10-19.)

186.   Chief Berkihiser himself did not make any effort to create such a policy for his officers. (Trial Exhibit #187 – Berkihiser Dep., 137:2-6.)

187.   During his tenure, Berkihiser was a member of the International Association of Chiefs of Police (IACP) and was aware that the IACP had published a model policy for responding to individuals experiencing a mental health crisis. While he stated that he tried to adopt as many IACP policies as possible, he could not recall the adoption of the IACP's "2018 Responding to Persons Experiencing a Mental Health Crisis" policy. He further testified that if the policy had been adopted, it would have been reflected in the LCBP's policy and procedure manual. (Trial Exhibit #187 – Berkihiser Dep., 59:3-60:14.)

188.   The LCBP policy and procedure manual does not include the IACP's "2018 Mental Health Crisis Response" policy. (Trial Exhibit #26 – Defs.' Production p.938-1019.)

189.   "In 1987, the IACP entered into a cooperative agreement with the U.S. Justice Department's Bureau of Justice Assistance to establish a National Law Enforcement Policy Center. The purpose of the center was to assist law enforcement administrators across the country in the task of developing law enforcement policies that reflect nationally recognized professional practices." (Trial Exhibit #222 – Dan Linskey Expert Report.)

190.    IACP's "2018 Responding to Persons Experiencing a Mental Health Crisis" contains the following guidance:

a.   Responding to situations involving a Person in Crisis

(PIC)…**necessitates the use of special skills, techniques, and abilities** to effectively and appropriately resolve the situation, while minimizing violence. (Trial Exhibit #72 – IACP Policy p.1.)

b.   A backup officer should be summoned to provide assistance. (Trial Exhibit #72 – IACP Policy p.8.)

c.   At the scene of an incident involving a PIC, officers should first take time, if possible, to asses the situation and gather necessary information, avoiding hasty and potentially counterproductive decisions and actions. Such calls have a better outcome if time is used to an officer's advantage. (Trial Exhibit #72 – IACP Policy p.6.)

d.   The model policy explains: "the mere presence of law enforcement vehicle, an officer in uniform, and/or a weapon may be seen as a threat to a PIC [person in crisis] and has the potential to escalate the situation. Standard law enforcement tactics may need to be modified to accommodate the situation when responding to a PCI." (Trial Exhibit #72 – IACP Policy p.3.)

e.   Elsewhere, the policy states: "A PIC may rapidly change their presentation from calm and command responsive to physically active. A variation in the person's physical presentation does not necessarily

mean they will become violent or threatening, but officers should be prepared at all times for a rapid change in behavior. (Trial Exhibit #72 – IACP Policy p.3.)

 f. The IACP Model Policy states that there is a specific HIPAA exception for law enforcement officers (45 CFR 164.512(j)(1)(i)(A)) to freely share mental health information about citizens in connection with their official duties to protect others. (Trial Exhibit #72 – IACP Policy p.3.)

191. Before September 2020, the LCBP had no policy, procedure, custom, or practice requiring officers to check the system for prior interactions with individuals before responding to a mental health call. (Trial Exhibit #187 – Berkihiser Dep., 115:21-116:3.)

192. Additionally, the LCBP lacked a policy to address repeated encounters with individuals suffering from mental health disabilities. Chief Berkihiser testified:

> Q: Did you have any type of custom and practice or policy and procedure that said that if police officers are interacting with an individual who's suffering from mental health disabilities on a repeated basis, the officers are to look at the interactions and figure out if there's a way that they can come up with a plan for future interactions?
> A: No.

(Trial Exhibit #187 – Berkihiser Dep., 119:2-10.)

193. When asked if he has ever seen a policy and procedure from LCBP detailing what reasonable modifications were going to be made at the department for individuals suffering from disabilities, Officer Arnold said he did not recall specifics. (Trial Exhibit #189 – Arnold Dep., 102:8-13.)

194.    Asked again whether he has seen a policy and procedure detailing examples of reasonable accommodations for individuals suffering from schizophrenia, Officer Arnold testified that he did not the specifics of whether there is such a policy. (Trial Exhibit #189 – Arnold Dep., 103:3-9.)

195.    The only written policy that addresses the ADA with some level of detail is a policy for individuals suffering from hearing impartments. (Trial Exhibit #44 – LCBP Polies p. 283)

196.    No similar policy exists for people with mental health disabilities. (*See* (Trial Exhibit #44 – LCBP Policies; Trial Exhibit #26 – Defs. Production at 938-1014.)

197.    Arnold is not aware of any specific policy at LCBP that informs the officers what a "qualified individual" under the ADA means. (Trial Exhibit #189 – Arnold Dep., 105:6-13.)

198.    Officer Arnold does not recall ever seeing an LCBP policy and procedure specifically setting forth what equipment police officers are to bring to calls involving individuals who are experiencing a mental health disturbance. (Trial Exhibit #189 – Arnold Dep., 143: 13-23.)

199.    Officer Arnold does not know if an ADA grievance procedure exists. (Trial Exhibit #189 – Arnold Dep., 154:8-13.)

200.    Officer Arnold is not aware of any written policy that sets out the specific responsibilities for the primary officer assigned versus the secondary responding officer. (Trial Exhibit #189 – Arnold Dep., 54:20-55:1.)

201.    While the LCBP has policy on "Response to Emergencies" mentions notifying emergency services and providing first aid, it lacks specificity about the type of care required, timeframes for action, and accountability measures. (Trial Exhibit #26 – Defs. Production at 994.)

202.    LCBP's use-of-force policy insufficiently provides for less than-lethal tactics, de-escalation tactics, and strategies particular to individuals suffering from mental health crisis. (Trial Exhibit #26 – Defs.' Production, p.1006-1014.)

## LCBP'S HISTORY OF USING EXCESSIVE FORCE AND DENYING MEDICAL CARE

203.    In *Williams v. Bernot*, 5:18-cv-02773 (L. Sitarski), LCBP Officer Phil Bernot used **excessive force** by discharging a taser on an individual who was sitting on the sidewalk. (Trial Group Exhibit #A4.) Officer Mazante was personally witnessed the incident. Yet, she never participated in any "After Action Review". Other than the private law firm hired to represent Mr. Williams, there was no other *independent* entity that ever conducted an independent investigation of Officer Bernot's actions. Officer Mazzante does not believe that her supervisors ever addressed with them what needed to be done differently when discharging the taser. (Trial Exhibit #186 – Mazzante Dep., 97:21-102:14.)

204.    In *Rineer v Miller, 2:03-cv-03079*, two LCPB officers were sued for **using excessive force** during an **arrest in 2001**.  Mr. Rineer was smoking a cigarette in his pickup truck which was parked on his private lot. Officer Miley and Officer Genetti demanded Mr. Rineer's identification and interrogated Mr. Rineer about his presence on the lot and his vehicle. Mr. Rineer responded to the officers that they were on private property and asked them to leave. "Mr. Rineer did not struggle or right the officers, but instead, passively resisted efforts to place him in handcuffs. One of the defendants then pepper-sprayed Mr. Rineer, after which he was placed in handcuffs." The City settled these claims.  (Trial Exhibit – Group A#5.)

205.    In *Soto v City of Lancaster*, 2:02-cv-00852 (F. Van Antwerpen), two LCBP officers were sued for arrest without probable cause, **delaying medical care**

**and excessive force** during an **arrest in 2001**. Mr. Soto was pulled over by an unmarked police vehicle and the LCBP officers gave him conflicting instructions. Mr. Soto was unsure of which directions to follow and took a pause. Then, the officers took Mr. Soto out of his vehicle and began to beat him.  Th city settled these claims.

206.     In *Johnson v Heim,* 2:03-cv-05517 (P. Tucker), two LCBP officers were sued for **using excessive force** during an **arrest in 2001**. Mr. Johnson's parked car had just been impacted by another vehicle.  Mr. Johnson was talking with a tow truck operator when Officer Gerace and Office Ziegler demanded that he stop talking with the tow truck operating towing his car. The officers "forcefully grabbed plaintiff's arms, pushed plaintiff to the ground by his neck, choked him and removed the neck race plaintiff was wearing due to recent spinal surgery on his neck."  The City settled these claims. (Trial Exhibit – Group A#6.)

207.     In *Smith v Heim*, 2:04-cv-05901 (G. Pratter), three LCBP officers were **sued for using excessive** force during an **arrest in December 2001**. Ms. Smith was parked in her vehicle when Officer Gerace demanded that she exit her vehicle. Ms. Smith asked the officers to handcuff her with her hands in front instead of behind her back due to pre-existing injuries. The officers disregarded Ms. Smith's request and proceeded to violently arrest her with her hands behind her back, causing a traumatic spiral fracture of the humorous bone of Ms. Smith's right arm. The City settled these claims. (Trial Exhibit – Group A#7.)

208.    In *Trout v Brault*, 2:04-cv-04451 (J Hart), two LCPB officers were sued for unreasonable seizure and for **using excessive force** during an **arrest in 2002**. Plaintiff was seized by the officers when he approached his wife who was walking with the two officers. Plaintiff had not committed a crime, and he did not resist the arrest but had his arm twisted behind his back and was repeatedly kicked by the LCBP officers. Mr. Trout was finally transported to Lancaster General Hospital, after being detained for five hours. He underwent surgery to his right thigh for the injuries he sustained during his arrest. The City settled these claims. (Trial Exhibit – Group A#2.)

209.    **In 2002**, LCBP Detective John Burkhart was investigating a rape case. A witness to the rape reported that Burkhart **used excessive force** and assaulted him during the investigation. The Attorney General brought charges against Burkhart for assault and recklessly endangering another person. (Trial Exhibit #187 – Berkihiser Dep., 91:5-21.) The local newspaper reported that Burkhart's "tenure was also marred by accusations that he assaulted two men and threatened one with a gun during 2002 rape investigation."[1] In 2003 Burkhart went to prison for stealing funds seized by the agency between 2014 to 2020. He was ordered to pay restitution of $140,000.[2] (Trial Exhibit #235 – John Burkhart Complaint.)

---

[1] https://lancasteronline.com/crime/who-is-john-burkhart-the-former-lancaster-county-drug-task-force-chief-charged-with-theft/article_fe93832e-a4a6-11ec-bac4-0305dc9f2294.html
[2] https://local21news.com/news/local/police-officer-prison-probation-custody-drug-task-force-attorney-general-charge-john-burkhart-stealing-funds-jail-seize-cash-asset-criminal-case-lancaster-county-pennsylvania

210.    In *Loefler v City of Lancaster*, 2:05-cv-02223 (H. Bartle, III) four LCBP officers were sued **<u>for excessive force</u>** during an unwarranted **arrest in 2003**. Mr. Loefler was beaten by the LCBP officers while another kneeled on his back holding him down. Mr. Loefler's mother attempted to reach her son but a LCBP officer held the door shut to prevent her from coming out of her home. Ms. Loefler was also assaulted by one of the officers without reason. The City settled these claims. (Trial Exhibit – Group A#8.)

211.    In *Hiltner v Gerace*, 2:06-cv-04755 (J. Sanchez), a LCBP officer was **<u>sued for excessive force</u>** during an **arrest in 2004**. Mr. Hiltner witnessed his friend being beaten LCBP. Mr. Hiltner shouted to the officers, "Stop. Your gonna kill him. What's Wring with you. Stop it."  Mr. Hiltner received instructions from LCBP to step way and as he did, he was violently grabbed by another LCBP officer and place inside a police cruiser without cause. The City settled these claims. [3] (Trial Exhibit – Group A#3.)

212.    In *Wood v City of Lancaster*, 2:06-cv-03033 (S. Dalzell), LCBP officers were sued for excessive use of force during an unreasonable **arrest in 2004**.  LCBP officers approached Devon Lee Reid as he was sitting on his stoop. Mr. Reid ran away twice out of fear of the police and eventually was seized by the LCBP officers. The officers beat Mr. Leid causing severe injury including a pulmonary embolism that lead to his death. (Trial Exhibit – Group A#9.)

---

[3] Hiltner's Memo in Opposition to Summary Judgement is ECF #47. (Trial Exhibit – Group A#3.)

213.    In *Seals v City of Lancaster,* 2:06-cv-05554 (T. Golden), a LCBP officer was sued **<u>for excessive force</u>** during an **arrest in 2004**. Ms. Seals was in a brief argument with a patron at a night club when Officer Laser instructed Ms. Seals to return to her car. Ms. Seals complied and as she was returning to her car, Officer Laser placed Ms. Seals under arrest, grabbed her arms and violently threw her to the ground causing serious injuries to Ms. Seals. (Trial Group – Exhibit A#10.)

214.    In *Culbreth v. Corll*, 2:09-cv-04277 (T. Oneill, Jr.), two LCBP officers were sued for **<u>using excessive force</u>** during an **arrest in 2007**. "While Mr. Culbreth was handcuffed and face down on the trunk of the police car, Officer Croll used excessive force against Plaintiff, without provocation, by lifting his head off the trunk of the car and punching him several times in the face with a closed fist, causing Mr. Culbreth severe injury." The City settled these claims. (Trial Exhibit – Group A#11.)

215.    In *Bush v Corll*, 2:07-cv-03172 (J. Slomsky) LCBP Officer Corll was sued for **<u>using excessive force</u>** during an arrest **in 2007**. Mr. Bush was seized and forced to have his photograph taken. As Mr. Bush put his hands to his face so to cover himself from having his photograph unconstitutionally taken, Officer Corll beat Mr. Bush's face causing injury necessitating treatment in the emergency department. The City settled these claims. (Trial Exhibit – Group A#12.)

216.    In **S**ands-Reyes v Mendez*, 5:11-cv-05105 (J. Garnder) four LCBP officers were **<u>sued for excessive force</u>** and **<u>false imprisonment</u>** during a response to a domestic occurrence **in 2010**. Ms. Sands-Reyes was involved in a

confrontation with her former partner when the LCBP officers arrived and took her to the ground causing her a tooth fracture, Ellis III. Ms. Elis was treated at Lancaster General Hospital and was given orders to return within 24 hours for follow up. LCBP incarcerated Ms. Sands-Reyes preventing her from attending her follow-up appointment and did not provide alternative medical care. The City settled these claims. (Trial Exhibit – Group A#13.)

217.    In *Nives v City of Lancaster*, 5:14-cv-00833 (E. Smith) four LCBP officers were **sued for excessive force** during an arrest without probable cause **in 2012.** Mr. Nieves was sitting outside of his home when the officers drove by and exited their vehicles to ask Mr. Nieves and his friends for their identifications. Officer Miller and Officer Flurry handcuffed Mr. Nieves and a third officer tased Mr. Nieves causing him to fall and sustain injuries. The City settled these claims. (Trial Exhibit – Group A#14.)

218.    In *Howze v LCBP*, 14-cv-01545 (J. Schmehl) a LCBP was **sued for using excessive force in 2013**. Ms. Howze was attending an event when police activity caused a large crown to disperse. Ms. Howze was not part of the crowd engaging in any disturbance. As she was leaving the venue, Ms. Howze was pepper sprayed by the LCBP Officer without cause. (Trial Exhibit Group A#15.)

219.    On **March 8, 2014**, LCBP Sgt. Raymond Corll arrested a citizen for public intoxication. After his arrest, a complaint with LCBP **alleging excessive force**. Corll was disciplined for his actions, which constituted excessive force. The Attorney General investigated this incident and criminal charges were brought

against this officer. The City paid the victim $150,000. (Trial Exhibit #236 –

Pennlive Article – Sgt. Corll.);[4] (Trial Exhibit #184 – Hatfield Dep., 85:14-10.)

220.  In *Miller v. Burgett,* 5:19-cv-05309 (J. Schmehl), a LCBP officer was

**sued alleging excessive force** during an **arrest in 2017**.  Mr. Miller was walking

to a convenience store when Officer Hatfield suspected Mr. Miller of public

intoxication and arrested him. Mr. Miller stood still and cooperated while he was

being arrested when Officer Burgett punched Mr. Miller on the side of his head

causing serious injury. The City settled these claims.  (Trial Exhibit – Group A#16.)

221.  In approximately **2017 or 2018,** Officer Windlbleck **used excessive**

**force** during a "take-down technique that resulted in an injury to the suspect." This

incident was evaluated by the use-of-force instructors, who determined that Officer

Windlebeck should receive a written report for his incorrect use of force. (Trial

Exhibit #185 – Windlbleck Dep., 65:15-66:15.)

222.  In *Gray v City of Lancaster*, 5:18-cv-04578 (E. Smith) four LCBP

officers were **sued for excessive force in 2018**. Mr. Gray was at his home working

on his truck when Officers Bingham and Sinnot parked their vehicle and

approached Mr. Gray. The officers claimed to smell marijuana. Mr. Gray had

injuries and used marijuana for pain management. The officers instructed Mr. Gray

to put his hands over his head but Mr. Gray explained that due to his spine injury

he could not do as instructed. The officers slammed Mr. Grey to the ground and

stood on his legs. The excessive use of the officers causes Mr. Grey to suffer a

---

[4] https://www.pennlive.com/news/2017/03/trial_begins_for_lancaster_pol.html

hairline fracture in one of his knee replacements, neck and back contusions and scarring. The City settled these claims. (Trial Exhibit – Group A#17.)

223.    In *Williams v City of Lancaster*, 5:18-cv-02773 (L. Sitarski) LCBP Officers were **sued for excessive force** during a traffic stop **in 2019**. The Officers approached the vehicle Mr. Williams in with their guns drawn. After removing him from the vehicle, Officer McCormick threw Mr. Williams on the hood of his car with great force, frisked him, and kicked open his legs. Mr. Williams suffered a torn meniscus requiring surgery.  The City settled these claims. (Trial Exhibit – Group A#4.)

224.    In *Kreider v City of Lancaster*, 5:21-cv-02693 (E. Smith) two LCBP Officers, including Chief Berkihiser were **sued for use of excessive** force during an unprovoked attack **in 2020**. Ms. Kreider and her son were attending a peaceful protest when without any provocation, the LCBP officer pepper sprayed Ms. Kreider and then proceeded to pepper spray Ms. Kreider's minor son. LCBP refused to provide medical treatment resulting in Ms. Kreider's minor son suffering from chemical burns. The City settled these claims. (Trial Exhibit – Group A#18.)

225.    In *Kapepula v City of Lancaster*, 5:22-cv-04741 (M. Roberts Perez) LCBP officers were **sued for use of excessive use of force**. Ms. Kapepula was being forcibly evicted from her short-term residence and her roommate called LCBP to assist in removing Ms. Kapepula from the property. Officer Kanuck conducted a warrantless search of Ms. Kapepula's belongings and forced her onto the ground

with such force that it caused Ms. Kapepula to suffer a closed distal third spiral humeral fracture. (Trial Exhibit – Group A#19.)

226.    An article published by LPN Online in 2015 analyzing excessive-force lawsuits in Lancaster, Pennsylvania found that officers had engaged in numerous constitutional violations against the public[5]:

      a.    In one instance, officers were accused of tackling, punching, and kicking an individual by the name of Joshua Karoly, and subsequently denying him medical attention.

      b.    Another lawsuit alleged that an officer grabbed Ramona Silva, "pushed her against the vehicle and violently pulled her aims behind her," injuring her shoulder.

      c.    Other lawsuits alleged violations of use-of-force policy.

      d.    Then-Mayor Rick Gray admitted to widespread failures and practices of the police department and was quoted as saying "But I'm in no way trying to minimize [the allegations in the lawsuits]" and "[s]ome of these claims are legitimate." (Trial Exhibit #237 – LPN Online Article.)

### Past Instances of LCBP Officers Denying Medical Care

227.    In *Soto v. City of Lancaster*, 2:02-cv-00852 (F. Van Antwerpen), two LCBP officers were sued for arrest without probable cause, **delaying medical care** and excessive force during an **arrest in 2001**. Th city settled these claims. (Trial Exhibit – Group A#1)

---

[5] https://lancasteronline.com/news/local/lnp-analysis-police-in-lancaster-county-have-paid-out-2-4-million-to-settle-allegations/article_2895ecd8-6e9f-11e5-acf1-0b063e4135ef.html

228.    In *Trout v. Brault*, 2:04-cv-04451 (J Hart), two LCPB officers were sued for unreasonable seizure and for using excessive force during an arrest **in 2002**. Plaintiff was seized by the officers when he approached his wife who was walking with the two officers. Plaintiff had not committed a crime, and he did not resist the arrest but had his arm twisted behind his back and was repeatedly kicked by the LCBP officers. Mr. Trout suffered injuries to his face from being thrown face-first into the ground. **Mr. Trout was detained for five hours without medical care before finally being transported to Lancaster General Hospital**. The City settled these claims. (Trial Exhibit – Group A #2)

229.    In *Hiltner v. Gerace, et al*, 2:06-cv-04755 (J. Sanchez), seven LCBP officers was sued for excessive force and for **not providing medical care** during an arrest of a law student **in 2004**. After being kicked and punched by the police officers, Mr. Karoly pleaded for medical attention without avail.  After being booked, Mr. Karoly again asked the officers for medical attention but the officers laughed and mocked Mr. Karoly despite seeing him covered in blood even commenting, "awh fucking pussy needs medical attention."  Mr. Karoly was finally released but learned that no one had been contacted to pick him up or provide help. Allt his time Mr. Karoly was still bleeding from his face and mouth. Mr. Karoly's parents were then contacted by Mr. Karoly's friends and rushed him to Lehigh Valley Hospital. Mr. Karoly was placed in a neck brace and later underwent surgery for the injuries the LCBP officers inflicted. The City settled these claims.   (Trial Exhibit – Group A #3)

230.    In *Williams v City of Lancaster*, 5:18-cv-02773 (L. Sitarski) LCBP

Officers were sued for excessive force during a traffic stop **in 2019**. The Officers

approached the vehicle Mr. Williams in with their guns drawn. After removing him

from the vehicle, Officer McCormick threw Mr. Williams on the hood of his car with

great force, frisked him, and kicked open his legs. Mr. Williams suffered a torn

meniscus requiring surgery.  Mr. Williams complained to Officer McCormick that he

was in great pain after his knee buckled from the force the officer was using. The

LCBP **officers never offered or called for medical care** for Mr. Williams

despite his complaints. The City settled these claims.  (Trial Exhibit – Group A #4)

## NO INDEPENDENT INVESTIGATIONS

231.    Officer Arnold routinely collaborates with the District Attorney's (DA) office to bring charges against citizens. He estimates that 70% of his cases involving misdemeanors and felonies are handled in coordination with the DA's office. (Trial Exhibit #189 – Arnold Dep., 42:4-17.)

232.    Officer Ruiz testified that the DA's office maintains a close relationship with the LCBP. (Trial Exhibit #183 – Ruiz Dep., 8:6-11.)

233.    As part of his duties at the LCBP, Officer Ruiz routinely collaborates with the DA's office to bring charges against various individuals. (Trial Exhibit #183 – Ruiz Dep., 8:13-19.)

234.    Officer J. Hatfield confirmed that the LCBP frequently works with the Lancaster DA's office. He explained that the DA's office approves LCBP felony charges, assists in investigating officer-involved shootings, and supports major crimes investigations by offering opinions and guidance. (Trial Exhibit #184 – Hatfield Dep., 12:5-14.) Officer Hatfield testified that he has personally worked closely with the DA's office "over a thousand times in court cases." (Trial Exhibit #184 – Hatfield Dep., 13:6-13.)

235.    Officer Mazzante testified that during her 16 years with the LCBP, she has never participated in an investigation of LCBP or officer misconduct conducted by an organization independent of the Mayor's office. (Trial Exhibit #186 – Mazzante Dep., 83:14-19; 84:15-24.) She further stated that, aside from lawsuits

filed by private law firms, no independent organization has investigated the LCBP. (Trial Exhibit #186 – Mazzante Dep., 84:15-24.)

236.    The District Attorney, with the assistance of officers who have worked for the LCBP, conducted an investigation into this incident and concluded that Arnold's actions were justified. The investigation focused exclusively on the four seconds between Arnold's arrival at the scene and his discharge of his weapon. The DA's report made no reference to Mr. Muñoz's 26 prior known encounters with LCBP, his mental health disability, or the fact that Arnold had no plan for handling the situation. (Trial Exhibit #26 – Defs.' Production at 270-288.)

237.    During their investigation, none of the detectives questioned Officer Arnold about why he did not wait for backup before engaging Mr. Muñoz.  (Trial Exhibit #189 – Arnold Dep., 191:8-13.)

238.    Captain Winters authored a report concluding that Officer Arnold acted appropriately. Winters reached this conclusion without personally interviewing Arnold or questioning him about the timeline of events and how they evolved. (Trial Exhibit #26 – Defs.' Production p.288; Trial Exhibit #198 – Arnold Dep., 228:1-3.)

239.    Captain Winters worked closely with the DA office and was involved in every aspect of the investigation. (Trial Exhibit #26 – Defs.' Production, p.288.)

## NO MEANINGFUL DISCIPLINE

240.    Reports involving a police officer using force are internally investigated by the cadre, who are all police officers employed by LCBP. (Trial Exhibit #187 – Berkihiser Dep., 72:4-7.)

241.    Every report that involves a police officer using force eventually makes its way to the Chief of Police, in this case Berkihiser, regardless of whether any disciplinary action is given. (Trial Exhibit #187 – Berkihiser Dep., 70:12-20.)

242.    The police chief supervises and reviews the conclusions of the internal investigations team. (Trial Exhibit #187 – Berkihiser Dep., 74:21-75:9.)

243.    It was ultimately Berkihiser's decision, when he served as chief, whether any disciplinary action would be taken against any officer. (Trial Exhibit #187 – Berkihiser Dep., 76:23-77:3.)

244.    Officer Mazzante did not participate in any "After Action Review". (Trial Exhibit #186 – Mazzante Dep., 71:10-15.) She "probably opted not to go". (Trial Exhibit #186 – Mazzante Dep., 71:16-21.) The "After Action Review" was not mandatory. (Trial Exhibit #186 – Mazzante Dep., 73:1-3.)

245.    No supervisor ever discussed with Officer Mazzante the circumstances surrounding Ms. Peña's unlawful detention. (Trial Exhibit #186 – Mazzante Dep., 73:14-18; 74:10-23.)

246.    Despite "inviting" witnesses to come to the police station using the same tactics as the detention of Ms. Peña dozens of times, no supervisor has ever

sat down with Officer Mazzante to discuss whether those detentions were inappropriate. (Trial Exhibit #186 – Mazzante Dep., 73:19-64:9.)

247.    In fact, the first time Officer Mazzante learned about any criticisms regarding Ms. Peña's detention was one week before her deposition. (Trial Exhibit #186 – Mazzante Dep., 75:1-7.)

248.    Likewise, no supervisor has ever discussed with Officer Mazzante anything related to whether the response by the LCBP to a person suffering from a mental health disability was appropriate for Mr. Muñoz. (Trial Exhibit #186 – Mazzante Dep., 75:8-20.)

249.    Officer Mazzante is not aware of any officer who was disciplined or given any type of warning as a result of the action surrounding this lawsuit. (Trial Exhibit #186 – Mazzante Dep., 86:18-24.)

250.    In the lawsuit against Officer Phil Bernot (*Williams v. Bernot*), LCBP officers used excessive force by discharging a taser on an individual who was sitting on the sidewalk. (Trial Exhibit – Group A, #4.) Officer Mazante personally witnessed the incident. Yet, she never participated in any "After Action Review". Other than the private law firm hired to represent Mr. Williams, there was no other *independent* entity that ever conducted an independent investigation of Officer Bernot's actions. Officer Mazzante does not believe that her supervisors ever addressed with them what needed to be done differently when discharging the taser. (Trial Exhibit #186 – Mazzante Dep., 97:21-102:14.)

251.    The After-Action Review into the events of September 13, 2020, supervisor Michael Winters approved Officer Ruiz's narrative and signed the report. Yet he provided no feedback to Officer Ruiz. (Trial Exhibit #26 – Defs.' Production p.204; Trial Exhibit #183 – Ruiz Dep., 154:8-21.)

252.    Officer Windlebeck did not participate in the After-Action review for this case. He participated in no additional training or discussions about this incident. (Trial Exhibit #185 – Windlebeck Dep., 20:9-18.)

253.    Officer Arnold was not asked to provide a written report (Trial Exhibit #189 – Arnold Dep., p.32:6-9.)

254.    Officer Arnold did not participate in the after-action review (Trial Exhibit #189 – Arnold Dep., 34:20-35:2.)

255.    Officer Arnold was not asked to complete a "use-of-force" incident report. (Trial Exhibit #189 – Arnold Dep.,46:10-14.)

256.    The "After Action Review" involving the shooting of Mr. Muñoz did not involve anything beyond the few seconds when Mr. Muñoz is seen exiting the house and Officer Arnold shoots him. Hatfield Dep., 36:9-19. Although Officer Hatfield could remember how "good" officer Arnold had handled the situation, he could not remember a single thing that was discussed about room for improvement or what went bad during LCBP's response to this incident. (Trial Exhibit #184 – Hatfield Dep., 37:14-38:21; 152:13-22.)

257.    Despite being the person who fired his gun at Mr. Muñoz, Officer Arnold was not present at the "After Action Review" of this incident. (Trial Exhibit #184 – Hatfield Dep., 37:6-7.)

258.    Officer Arnold was awarded a "commendation for valor" for using deadly force to kill Mr. Muñoz on September 13, 2020. The commendation acknowledges that Officer Arnold "arrived alone" and that Mr. Munoz was an individual "who suffered from mental health issues." (Trial Exhibit #26 – Defs.' Production p.302.)

259.    The supporting documents accompanying the nomination do not mention Mr. Munoz's long history of encounters with the LCBP, the fact that no plan was ever created for future encounters, that Officer Arnold's only backup plan in dealing with a person in crisis was to use deadly force, or that Officer Arnold did not provide any type of first aid after he shot Mr. Munoz. (Trial Exhibit #26 – Defs.' Production p. 303-305.)

## THE LCBP'S FAILURE TO MEANINGFULLY COMPLY WITH THE AMERICANS WITH DISABILITIES ACT

### The City/LCBP Are Required to Meaningfully Comply with the ADA

260.    The City of Lancaster receives significant financial assistance from the federal government, which necessitates compliance with the Americans with Disabilities Act ("ADA").

261.    Tina Campbell, the City's Director of Administrative Services, oversees four bureaus, including the LCBP, and reports directly to Mayor Danene Sorace. (Trial Exhibit #190 – Campbell Dep., 7:17-8:2; 14:23-15:2.)

262.    Ms. Campbell testified that in 2024 alone, the City of Lancaster received $48 million in federal funds. (Trial Exhibit #190—Campbell Dep., 1:3-12:5.)

263.    The LCBP operates with a substantial budget of approximately $25 million to $30 million, supported in part by federal grants provided through the Justice Department. (Trial Exhibit #190—Campbell Dep., 8:11-20; 9:18-10:22.)

264.    Given the substantial financial assistance the City receives from the federal government, the City, including LCBP, are required to follow the mandates of the ADA. (Trial Exhibit #224 – Mr. Dubin's Expert Report)

265.    The LCBP handles mental health cases and incidents daily, often at least once per shift. (Trial Exhibit #184 – Hatfield Dep., 56:23-57:15.) The volume of mental health calls has been increasing over the years. (Trial Exhibit #184 – Hatfield Dep., 93:15-19.)

266.    Chief Berkihiser testified that "I would probably say at least 50 percent of the calls that are handled by the police department have some type of mental

health or substance abuse component to that call." (Trial Exhibit #187 – Berkihiser Dep., 133:13-16.)

### The LCBP/The City Have Failed to Create Programs or Make Accommodations that Meaningfully Benefit People with Disabilities

267.    The ADA impacts virtually all aspects of law enforcement activities, including receiving citizen complaints, interrogating witnesses, arresting, booking, and holding suspects, operating 911 emergency centers, providing emergency medical services, and enforcing the law. (Trial Exhibit #227 – Mr. Dubin Expert Report, p.8/17.)

268.    Ms. Campbell, a disclosed expert by the City in this case, was also unaware whether the ADA applied to police encounters. (Trial Exhibit #190 – Campbell Dep., 46:2-4.)

269.    Ms. Campbell testified that she was not aware of any policy modifications made by the Lancaster Bureau of Police (LCBP) regarding how the LCBP receives citizen complaints. (Trial Exhibit #190 – Campbell Dep., 58:7-12.)

270.    Ms. Campbell was also unaware of any modifications addressing how the LCBP interrogates witnesses with mental health disabilities. (Trial Exhibit #190 – Campbell Dep., 58:13-18.)

271.    Additionally, Ms. Campbell testified that she did not know of any policy modification in how the LCBP arrests, books, or holds suspects with mental health disabilities. (Trial Exhibit #190 – Campbell Dep., 58:19-23.)

272.    Regarding the operation of 911 emergency centers, Ms. Campbell explained that the City of Lancaster does not operate a 911 center, but was unaware

of any relevant policy modifications made for citizens of Lancaster City. (Trial Exhibit #190 – Campbell Dep., 58:24-59:7.)

273.    Ms. Campbell further testified that she was not familiar with any policy modifications made by the LCBP to provide emergency medical services for individuals experiencing mental health breakdowns. (Trial Exhibit #190 – Campbell Dep., 59:8-13.)

274.    Chief Berkihiser was the ultimate decision-maker for allocating a budget to the different programs specific to the LCBP. (Trial Exhibit #190—Campbell Dep., 38:16-39:24.)

275.    Despite knowing that approximately 50% of the calls received by LCBP involve mental health issues, between 2010 and 2020, crisis intervention training was not mandatory for the LCBP officers. (Trial Exhibit #187 – Berkihiser Dep., 42:19-23.)

276.    There is no law-enforcement-based Crisis Intervention Team funded by the LCBP and no part of the budget is allocated to a crisis intervention team. (Trial Exhibit #190—Campbell Dep., 41:10-23.)

277.    Among other things, ADA also mandates that entities like the Lancaster City Bureau of Police (LCBP) have "a qualified ADA coordinator" to ensure that disabled citizens can access programs and services on equal terms. (Trial Exhibit #224 – Mr. Dubin's Expert Report, p.8/17.)

a. The City (not the LCBP) has listed an individual as the "ADA Coordinator." But the ADA coordinator is not full-time role. (Trial Exhibit #190—Campbell Dep., 30:8-9.)

b. The person designated as an ADA coordinator is an "administrative services manager" who spends "**less than one percent**" of her time performing her duties as ADA coordinator. (Trial Exhibit #190—Campbell Dep., 31:3-32:2.) In other words, of the 40 hours per week, the "ADA coordinator" spends **less than half an hour per week** dealing with the ADA. (Trial Exhibit #190—Campbell Dep., 36:17-24.)

c. The City has not even created a job description for an ADA coordinator. (Trial Exhibit #190—Campbell Dep., 26:16-19.) Although Ms. Campbell testified that she had been selected to testify on behalf of the City on these issues and was disclosed as an expert witness, she could not confirm that who the ADA coordinator was in 2020. (Trial Exhibit #190—Campbell Dep., 28:9-17.)

d. The person designated as "ADA coordinator" does not have any type of certification related to the ADA and does not provide any training to City employees. (Trial Exhibit #190—Campbell Dep., 32:11-17.)

e. The ADA coordinator does not do anything to address how police officers are to respond when there is a call from an individual suffering from a mental health crisis. (Trial Exhibit #190—Campbell Dep., 46:10-15.)

f.  This ADA coordinator position was vacant for over 8 months between June 2023 and April 2024. (Trial Exhibit #190—Campbell Dep., 35:16-36:2.)

g.  The ADA coordinator does not receive any budget specifically for her role. Likewise, the City of Lancasters has not specific budget targeted to dealing with issues related to the ADA. (Trial Exhibit #190—Campbell Dep., 37:1-10.)

h.  Although required by law to have information about the ADA coordinator, LCBP does not provide any information about the ADA coordinator. (*See* Trial Exhibit #190—Campbell Dep., p.47-49.)

i.  When Plaintiff's expert attempted to call the police department to obtain information about the ADA, no one at the department had any knowledge of this individual. (Trial Exhibit #224 – Mr. Dubin's Expert Report, p.6/17.)

278.  The ADA notice on the City of Lancaster's website (which is different from LCBP's), only references physical disabilities, but not mental health disabilities. (Trial Exhibit #190 – Campbell Dep., p.53-56.)

279.  The LCBP does not have any system in place to identify repeat interactions with people suffering from mental health disabilities. (Trial Exhibit #184 – Hatfield Dep., 147:20:148:11.) Therefore, none of Mr. Munoz's history was ever shared with Officer Arnold. (Trial Exhibit #189 – Arnold Dep., 183:18-184:14.)

280.   The LCBP does not have a system in place to place hazard alerts on a particular address. (Trial Exhibit 189 – Arnold Dep., 186:1-14.)

### Police Officer Lack Knowledge and Training about their Duties Under the ADA

281.   Despite the prevalence of these cases, LCBP officers have little knowledge of the ADA. Officer Hatfiled testified that the District Attorney's office provides guidance and legal updates, but he has never received any such guidance regarding compliance with the ADA. (Trial Exhibit #184 – Hatfield Dep., 89:3-24.)

282.   Although Officer Hatfield knows what the ADA is, he is not aware of ever having received any training on the ADA over the course of his time with the LCBP. (Trial Exhibit #184 – Hatfield Dep., 113:16-114:6.)

283.   Officer Hatfield admitted that he is not familiar with how the ADA may apply to police departments and police officers. (Trial Exhibit #184 – Hatfield Dep., 143:17-144:3.)

284.   Officer Ruiz likewise is not aware of what the ADA requires of police officers. (Trial Exhibit #183 – Ruiz Dep., 159:23-160:6.)

285.   Officer Ruiz testified that he "didn't have any information" or "understanding" as to which individuals qualify for protections under the ADA. (Trial Exhibit #183 – Ruiz Dep., 161:5-15.)

286.   Officer Ruiz could not answer and did not know if he ever received training on how to identify individuals who qualify for protections under the ADA. (Trial Exhibit #183 – Ruiz Dep.,162:20-163:5.)

287.    Officer Arnold testified that he does not know if the LCBP has an ADA grievance procedure. (Trial Exhibit #189 – Arnold Dep., 154:8-13.)

288.    The LCBP does not adjust the way they handle mental health responses versus other calls. LCBP officers "still respond to them in the same way." (Trial Exhibit #184 – Hatfield Dep., 153:1-10.) Officer Arnold would have responded exactly the same to this situation regardless of whether it was categorized as a mental health call or a domestic disturbance call. (Trial Exhibit #189 – Arnold Dep., 75:12-21.)

289.    When asked if he had received specific guidance as to how to modify his response to an individual suffering from a mental health disability versus someone else in the community, he reiterated that the approach "just goes back to being a good human being." (Trial Exhibit #189 – Arnold Dep., 178:2-179:19.)

### he LCBP/the City Failed to Provide Mr. Munoz with reasonable modifications to accommodate his disability.

290.    Plaintiff's experts have opined regarding a number of reasonable accommodations that could have been implemented in the years, months, and hours that led to the shooting. For example, Mr. Dubin has opined that, before September 13, 2020, the LCBP was required to make reasonable modifications of policies to address Mr. Muñoz's disability, including:

    a.  Placing a hazard alert on his name/address;

    b.  Modifying the data collection forms, including the Incident Reports, to distinctly identify him as someone with disabilities and entitled to protections under the ADA;

   c.  Creating a designated team within the Department that is trained on mental health issues and is responsible for responding to such calls;

   d.  Mandating CIT training for all the police officers;

   e.  Creating a communication system between the Department and County Communications where information about callers is properly transferred between agencies;

   f.  Providing Mr. Muñoz with access to a social worker or mental health professional during each of his encounters with police officers.

(Trial Exhibit #224 – Mr. Dubin's Report, p.16-17.)

291.  Likewise, Mr. Linskey has opined that "Because there was no program or policies on how to respond to individuals with disabilities numerous opportunities to intervene without a use of force were squandered:"

   a.  LCWC had the ability to place premise alerts into its CAD system to enhance the safety of people with disabilities, but LPD never coordinated a response with LCWC. These individuals, their families, and/or their caregivers could have voluntarily submitted information about their circumstances for inclusion in the CAD alert.

   b.  Muñoz encountered various public safety agencies over 25 times in which information was identified that he was a person suffering with a disability. Each call was handled in the moment but there was no data tracking program or system to document information regarding those encounters.

c.  Arnold was stationary at the time of receiving the call and physically checked the CAD System for information before responding. If the information that had been obtained about Muñoz in the prior incidents had been documented in a premise alert Arnold, although new on the job, like most reasonable officers armed with the information from prior incidents involving Muñoz and the location would not have responded alone and placed himself at a tactical disadvantage at the base of the Muñoz' staircase.

d.  Windelbleck and Ruiz, both veteran officers, if armed with prior information about Muñoz's disability and past police encounters from the CAD as any reasonable officer would have informed Arnold to meet up and stage while they developed a plan.

e.  Any one of the dispatchers, officers, or supervisors who would have had that past knowledge could have called back the caller to get more information and determine the best manner to respond.

(Trial Exhibit #222 – Mr. Linskey Report p.37-38; see also p. 24.)

292.  During "Staging", an officer can be designated as the person who will deploy less-lethal force and one as the lethal force to be ready for rapidly changing circumstances. (Trial Exhibit #189 – Arnold Dep., 193:7-15.)

### <u>A different response was possible that would have<br>preserved Mr. Muñoz's life</u>

293.  Officer Arnold testified that three years after Mr. Muñoz's unnecessary death, he responded to an incident involving an individual who was suffering from

mental health issues. An individual was threatening to commit suicide, and a police response was needed. The primary responding officers called their partners at County to assist them with the response. They were able to obtain substantial information about the individual before approaching the scene. (Trial Exhibit #189 –Arnold Dep., 86:21-90:18)

294.    Officer Arnold testified: "we were able to do this because we had a plan in place—for, like, a few days beforehand, or at leas a few—several hours beforehand." (Trial Exhibit #189 – Arnold Dep., 87:21-8). There were at least four or five people who responded from the police department alone. "Again, we had a plan in place…" (Trial Exhibit #189 – Arnold Dep., 90:9-14)

## DEFENDANTS UNLAWFUL DETENTION OF MS. PEÑA

295.   Minutes after the shooting, Ms. Peña was detained by the LCBP officers "without any reason." (Trial Exhibit #180 – Peña Dep., 78:20-21.)

296.   At the time of her detention, Ms. Peña was "in a delirious state." (Trial Exhibit #183 – Ruiz Dep., 17:9-18:3.)

### LCBP officers Collectively decided to detain Ms. Peña without justification

297.   When Officer Ruiz and Officer Mazzante arrived at the scene, several officers, including Officers Arnold, Windlebleck, Binderup, and Dickinson, were already present, along with at least three police units. (Trial Exhibit #183 – Ruiz Dep., 72:12-22, 80:13-22.)

298.   Officer Mazzante testified that detaining Ms. Peña was a "collective" decision, agreed upon by the officers on scene, who decided to take her to the police station. (Trial Exhibit #186 – Mazzante Dep., 27:16-28:14.)

299.   None of the officers, including the sergeants present, objected to or intervened in the decision to detain her and place her in the back of a police vehicle. (Trial Exhibit #186 – Mazzante Dep., 43:11-16.)

### Ms. Peña was detained against her will

300.   Officer Mazzante ordered Officer Ruiz to bring Ms. Peña to the police station. Officer Ruiz testified that he did not feel he could disregard her orders. (Trial Exhibit #183 – Ruiz Dep., 124:10-13.)

301.   Officer Ruiz and Officer Mazzante placed Ms. Peña, who was barefoot, in the back of a marked police vehicle. (Trial Exhibit #186 – Mazzante Dep., 33:14-

18.) Officer Ruiz transported her to the police station in a cruiser with the lights on. (Trial Exhibit #183 – Ruiz Dep., 92:10-11.)

302.    Ms. Peña was not given an opportunity to retrieve her shoes, keys, ID, credit card, cellphone, or sweater. She was also not allowed to speak with her daughters to see if they might accompany her. (Trial Exhibit #183 – Ruiz Dep., 94:24-96:4; Trial Exhibit #186 – Mazzante Dep., 33:20-34:24.)

303.    Once in the police car, Ms. Peña was locked in without a mechanism to open the door herself. The only way she could exit was if an officer let her out. (Trial Exhibit #183 – Ruiz Dep., 96:23-97:9; Trial Exhibit #186 – Mazzante Dep., 62:3-19.)

304.    Officer Ruiz's BWC shows the following:

a)  Ms. Peña is in the back to the cruiser.

b)  The siren lights are on.

c)  Ms. Peña is heard punching the inside of the door and saying "Let me out; let me out."

(Trial Exhibit 201 – Ruiz BWC; Trial Exhibit #200 – Certified translation)

305.    When Officer Ruiz arrived at the police station, he placed Ms. Peña in an interview room with two separate doors. (Trial Exhibit #183 – Ruiz Dep., 97:10-14.)

306.    Officer Ruiz's report indicates that after Ms. Peña was taken to the police station, several other officers were present, including Sgt. Whiteford, Officer Neidermyer, and two district attorney detectives. Despite knowing that Ms. Peña had

been detained, none of them intervened to protect her rights or ensure that her detention was lawful. (Trial Exhibit #26 – Defs.' Production, p. 203-204.)

307.    The police station video captures the following:

a)  Ms. Peña repeatedly asks Officer Ruiz, "Why am I here?" "What am I doing here?" and "I have to get out of here."

b)  She tells Officer Ruiz in succession: "I want to leave here," "I want to leave here," "Let me out of here, mister," and "I want to leave here."

c)  Officer Ruiz is seen standing at the door, physically blocking Ms. Peña from exiting the room.

(Trial Exhibit #131 – Police Station Video; Trial Exhibit #183 – Ruiz Dep., 146:18-147:7; 148:4-7.)

308.    Ms. Peña repeatedly pleaded with Officer Ruiz to let her leave, but he refused. (Trial Exhibit #183 – Ruiz Dep., 97:15-20; (Trial Exhibit #180 – Peña Dep., 103:3-14). She "continually asked multiple times why she was brought into the station… [and] made multiple attempts to walk out of the police station." (Trial Exhibit #26 – Defs.' Production, p. 203-204; (Trial Exhibit #180 - Peña Dep., 102:17-21).)

309.    The LCBP officers did not let Ms. Peña leave until her lawyer called the station:

Q: So it was not until the attorney got involved that [Ms. Peña] was free to leave, right?
A: To my understanding, yes.

(Trial Exhibit #183 – Ruiz Dep., 132:12-18.)

310. Ms. Peña estimates that she was wrongfully detained for five to six hours. (Trial Exhibit #180 – Peña Dep., 83:1-2.)

    a. Officer Ruiz's shift ended at approximately 7:40 p.m. Before leaving, he transferred custody of Ms. Peña to other officers. At the time of his departure, Ms. Peña "was still in the detention room." (Trial Exhibit #183 – Ruiz Dep., 100:19-101:19.)

    b. Ms. Peña remained detained until later that night, when an attorney working for the ACLU called the station and requested her release.

311. Throughout her detention, no one informed Ms. Peña of her rights. (Trial Exhibit #180 – Peña Dep., 101:6-9.)

312. While detained at the police station, Ms. Peña was not allowed to communicate with her family. Rulennis Muñoz testified that when she tried calling Ms. Peña, officers would not allow her to speak with her. Rulennis was not informed whether Ms. Peña had been charged with a crime or had done anything wrong; she was simply told she could not speak with her. (Trial Exhibit #181 – R. Muñoz Dep., 129:15-24.)

313. Rulennis Muñoz contacted an attorney at the ACLU, although she could not recall their name. She stated that her mother had already been arrested by the time she spoke with the attorney. (Trial Exhibit #181 – R. Muñoz Dep., 75:3-8.) The attorney Rulennis Muñoz contacted ultimately secured Ms. Peña's release. (Trial Exhibit #181 – R. Muñoz Dep., 75:22-23.)

314.    During the five or six hours Ms. Peña was detained, she was never allowed to leave the room to use the bathroom or get a drink. (Trial Exhibit #180 – Peña Dep., 125:20-126:1)

315.    She also received no updates on her son's condition. (Trial Exhibit #180 – Peña Dep., 105:17-19.)

316.    When Ms. Peña finally returned home five to six hours after the shooting, her son's body was still on the sidewalk. (Trial Exhibit #180 – Peña Dep., 106:12-18.)

### LCBP officers had no probable cause to detain Ms. Peña

317.    At the time Officer Ruiz placed Ms. Peña in the back of the police vehicle she had committed no crime.  Ms. Peña was not under investigation for any reason. (Trial Exhibit #183 – Ruiz Dep., 70:6-11; 116:23-117:2; 70:13-14.)

318.    Officer Ruiz admitted that there was no probable cause to believe that Ms. Peña had committed any crime:

> Q: To your knowledge, at—at that point in time, Officer, when you arrived at the scene and you placed [Ms. Peña] in the back of the vehicle, did you have any probable cause to believe that she had committed any crime?
> A: No.
> Q: Did any of the officers who spoke with you tell you that they had any probable cause to believe that [Ms. Peña] had committed any crime?
> A: No.

(Trial Exhibit #183 – Ruiz Dep., 94:10-19.)

319.    Officer Mazzante also testified that Ms. Peña had committed no crime.

(Trial Exhibit #186 – Mazzante Dep., 31:14-17.)

320.    Officer Mazzante also admitted that there was no probable cause to detain Ms. Peña and bring her to the police station. M Trial Exhibit #186 – Mazzante Dep., 42:5-8.)

321.    Officer Mazzante admitted that there was no probable cause to detain Ms. Peña against her will at the police station. (Trial Exhibit #186 – Mazzante Dep., 40:17-24.)

### Ms. Peña was not informed of her rights

322.    Officer Ruiz testified that "no Miranda rights were needed [because] she was not under arrest" and did not observe Officer Mazzante, or any other officer, advising Ms. Peña of her Miranda rights. (Trial Exhibit #183 – Ruiz Dep., 71:1-6, 11-17; 80:23-90:6.)

323.    No officers present explained to Ms. Peña that she could refuse to go to the police station. (Trial Exhibit #186 – Mazzante Dep., 70:21-71:8.)

324.    Officer Mazzante confirmed she did not read Ms. Peña her Miranda rights or inform her of her right to refuse to go to the station. (Trial Exhibit #186 – Mazzante Dep., 31:18-23; 70:17-20.)

325.    Detective Whiteford, who entered the room where Ms. Peña was held, also failed to provide Miranda warnings or honor Ms. Peña's request to leave the station. (Trial Exhibit #183 – Ruiz Dep., 103:13-19; 104:8-14.) Neither Officer Ruiz nor Detective Whiteford informed Ms. Peña that she was not obligated to speak with them, nor did they offer her the opportunity to make a phone call or contact a lawyer. (Trial Exhibit #183 – Ruiz Dep., 105:15-23.)

326.    Officers Hannah Neidermyer and Sergeant Thomas, who were involved in Ms. Peña's detention, also did not inform her of her Miranda rights or that she was free to leave. Officer Ruiz, who was with Ms. Peña for over three hours, never heard either officer offer her the opportunity to call her family or a lawyer. (Trial Exhibit #183 – Ruiz Dep., 107:23-108:11.)

327.    The criminal investigation division detectives also knew that Officer Ruiz had Ms. Peña in an interrogations room, but they never asked Officer Ruiz whether there was probable cause to detain her. (Trial Exhibit #183 – Ruiz Dep., 130:21-131:18.)

**Officers at the LCBP Customarily Detain Citizens Without Probable Cause**

328.    Officer Ruiz testified that Ms. Peña's detention was consistent with the policies, procedures, and customs of the LCBP. Ruiz Dep., 113:4-11. He acknowledged that detaining witnesses in the manner used with Ms. Peña reflected the standard practice at LCBP:

> Q. And in the conversation in the -- in the body-worn camera video that you have, at one point you did tell her that whenever things like this happen, it was the custom or it was the practice to bring witnesses to the police station, right?
> A. Yes.
> Q. And that was your understanding in terms of the practice at Lancaster Police Department?
> A. Yes.

(Trial Exhibit #183 – Ruiz Dep., 98:13-21.)

329.    These customs are so deeply ingrained in the LCBP that officers consider them routine and unremarkable:

Q: Did it seem out of the ordinary to you to be asked to bring [Ms. Peña] to the police station and to place her in a room and not let her leave until she spoke with a detective; did it seem out of the ordinary?
Mr. Macmain: Objection.
A: **No.**

(Trial Exhibit #183 – Ruiz Dep., 119:1-6.)

Q: So it didn't raise any flags for you to [] be asked to bring [Ms. Peña] to the station and to not let her leave until detectives spoke to her?
Ms. Munion: Objection
Mr. Macmain: Objection.
Ms. Munion: you may answer.
Officer Ruiz: **No.**

(Trial Exhibit #183 – Ruiz Dep., 119:9-16. )

Q: Did it seem out of the ordinary to you to not offer [Ms. Peña] the ability to call a lawyer or to call a family member when she was detained in the interview room?
Ms. Munion: Objection
Mr. Macmain: Same objection.
Ms. Munion: you may answer.
Officer Ruiz: **No.**

(Trial Exhibit #183 – Ruiz Dep., 119:18-120:1.)

330.    Officer Ruiz admitted that Ms. Peña requested to leave at least five times. Rather than honoring her requests, he refused to let her leave and instead offered her "moral support" while keeping her confined in an interrogation room against her will. (Trial Exhibit #183 – Ruiz Dep., 127:9-129:5.)

331.    Although Officer Mazzante now attempts to reframe Ms. Peña's detention as an "invitation" (Mazzante Dep., 36:8-16), she conceded that she has employed the same tactics in the past to detain citizens. (Trial Exhibit #186 – Mazzante Dep., 37:6-10.)

332.    Officer Mazzante "can't count" how many times she has engaged in these tactics to bring witnesses to the police station because "there's lots of circumstances", but estimated that she has done this more than ten times. (Trial Exhibit #186 – Mazzante Dep., 73:19-2.)

333.    Despite "inviting" witnesses to come to the police station using the same tactics as the detention of Ms. Peña dozens of times, no supervisor has ever sat down with Officer Mazzante to discuss whether those detentions were inappropriate. (Trial Exhibit #186 – Mazzante Dep., 73:19-64:9.)

334.    Officer Mazzante admitted she was unaware of any written policy outlining when it is appropriate to bring witnesses to the police station. (Trial Exhibit #186 – Mazzante Dep., 30:7-11.)

335.    The pattern of improper detentions at LCBP is not confined to Ms. Peña's case. In 2018 or 2019, Officer Hatfield and two colleagues, Officers Pareka and Schaefer, arrested a juvenile without authorization from the District Attorney. A complaint was filed by the juvenile's father, and all three officers received written reprimands. (Trial Exhibit #184 – Hatfield Dep., 71:19-74:10.)

336.    In *Colon v. Lancaster City Bureau of Police*, 5:23-cv-01930 (J. Schmehl), LCPB officers were accused of searching certain premises without probable cause and of false imprisonment. The City settled these claims. (Trial Exhibit – Group A#20.)

337.    In *Hiltner v. Gerace* et. al, 2:06-cv-04755 (J. Sanchez), six LCPB officers were accused of falsely imprisoning four different plaintiffs without probable cause. The City settled these claims. (Trial Exhibit – Group A#3.)

## LCBP Supervisors Are Aware of, Approve, and Fail to Supervise Detention Practices

338.    Officer Mazzante confirmed that she does not require permission from her supervisors to detain individuals in the manner Ms. Peña was detained. (Trial Exhibit #186 – Mazzante Dep., 29:2-8.) She has been given discretion to use similar detention tactics with other citizens. (Trial Exhibit #186 – Mazzante Dep., 38:6-17.)

339.    Every police encounter requires a report, and all incident reports are reviewed and approved by a supervisor. (Trial Exhibit #186 – Mazzante Dep., 50:19-51:6.) When asked whether her supervisors reviewed and approved reports for every incident where she detained citizens similarly to Ms. Peña, she testified:

> Q. Okay. And so [earlier] we talked about [other] incidents where you had invited people to come to the police station just like you had done [with Ms. Peña], would it be fair to say that under each and every circumstance when that had happened, one of your supervisors would have read your report and approved it?
> A. Yes.

(Trial Exhibit #186 – Mazzante Dep., 51:7-14.)

340.    Despite detaining individuals in this manner more than ten times, no supervisor has ever discussed the appropriateness of her actions. (Trial Exhibit #186 – Mazzante Dep., 74:3-9.)

341.    Detectives involved in Ms. Peña's detention did not explain to Officer Ruiz what constitutes appropriate conduct when detaining individuals without probable cause. (Trial Exhibit #183 – Ruiz Dep., 109:11-16. )

342.    Officer Ruiz testified that in the months before this incident, he received no training about what would be appropriate conduct when police officers

ask citizens to come to the police station when they had not committed any crime. (Trial Exhibit #183 – Ruiz Dep., 109:17-24.)

343.    Officer Ruiz also stated that no one at the LCBP trained him on the potential civil rights violations involved in detaining individuals or telling them they could not leave. (Trial Exhibit #183 – Ruiz Dep., 111:5-9.)

344.    Officer Ruiz has never received any training about when it would be appropriate to question someone's orders or requests. (Trial Exhibit #183 – Ruiz Dep., 124:24-125:4.)

## **DEFENDANTS' BATTERY AGAINST MS. PEÑA**

345.    Officer Mazzante testified that she observed Officer Windlebleck "pushing" Ms. Peña, describing the push as "forceful." (Trial Exhibit #186 – Mazzante Dep., 60:8-61:11.)

346.    According to Ms. Peña, the police officer "pushed [her] very strongly against a car." (Trial Exhibit #180 – Peña Dep., 87:12-18.)

347.    Ms. Peña documented the bruises she sustained from the officer's actions by taking photographs. (Trial Exhibit #2 – Photos produced by Ms. Peña.)

348.    At the time that Ms. Peña was tackled, she was asking the officer why he had shot her son. She testified that, in her view, she had not committed any crime that would justify being tackled or pushed against the car. (Trial Exhibit #180 – Peña Dep., 111:6-17.)

## DEFENDANTS CAUSED MS. PEÑA TO SUFFER
## EXTREME EMOTIONAL DISTRESS

349.    Immediately following the shooting, Ms. Peña was visibly distraught and "overcome with grief." According to testimony, she was "in the process of like not being able to stand." (Trial Exhibit #185 – Windlebleck Dep., 236:4-9)

350.    Officer Ruiz described Ms. Peña's state minutes after the shooting as "delirious." He also noted that she was barefoot at the time. (Trial Exhibit #183 – Ruiz Dep., 17:9-18:3.)

351.    Ms. Peña testified that since Mr. Muñoz's death, she has struggled significantly with memory issues, stating, "I forget things a lot. A lot of headaches as well. I've had headaches for the past few days. A lot of pain." (Trial Exhibit #180 – Peña Dep., 100:1-8.)

352.    She further elaborated on the profound impact of her loss: "My whole life changed. I am forgetting everything. I just have constant pain. Only a mother can know this. A mother is the only one that can know. I haven't done another Thanksgiving or—or another Christmas. I haven't been able to go back to it. There's no words." (Trial Exhibit #180 – Peña Dep., 121:1-6.)

## CONCLUSION

For the reasons set forth in Plaintiff's accompanying memorandum, the defendants' motions for summary judgment should be denied.

Date: January 13, 2025

Respectfully submitted,

By: /s/ *Daisy Ayllon*
Daisy Ayllon
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark, Suite 900
Chicago, Illinois 60602
P: (312) 458-1000
F: (312) 458 – 1004
Attorney No.: 35875
dayllon@rblaw.net

Michael Perna
Ryan Borchik
**PERNA & ABRACHT, LLC**
610 Millers Hill
P.O. Box 96
Kennett Square, PA 19348
P:(610) 444-0933
F: (610) 444-5695
mperna@pa4law.com
rborchik@pa4law.com
***Attorneys for Plaintiff, Miguelina Peña, individually and as independent administrator of the estate of Ricardo Muñoz, deceased.***

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

David MacMain
Matthew Estberg
MacMain Leinhauser
433 W. Market Street, Suite 200
West Chester, PA. 19382
dmacmain@macmainlaw.com
mestberg@macmainlaw.com

98